657 A.2d 847

IN THE MATTER OF HOWARD C. TRUEGER,
AN ATTORNEY AT LAW.

Argued January 3, 1995—Decided May 5, 1995.

---

*Walton W. Kingsbery, III,* Deputy Ethics Counsel, argued the cause on behalf of Office of Attorney Ethics.

*Donald R. Belsole* argued the cause for respondent (*Roy E. Kurnos,* attorney).

PER CURIAM.

This matter involves three formal complaints that charged respondent, Howard C. Trueger, with misconduct in three separate matters. The District X Ethics Committee (DEC) determined that respondent had committed misconduct in each matter, and recommended that respondent receive public discipline. The Disciplinary Review Board (DRB) found that the DEC's conclusion that respondent had acted unethically was "fully supported by clear and convincing evidence." However, the DRB rejected some of the DEC's specific findings of ethical violations. The DRB unanimously recommended that respondent be suspended from the practice of law for one year.

I

In its Decision and Recommendation, the DRB summarized the relevant facts in each of the three matters based on the evidence presented at the hearings held before the DEC.

## A

The DRB first delineated the factual background of the *Sackner* matter:

In or about April 1988, respondent was retained by Dr. Stanley Sackner to bring suit to enforce a Florida judgment and to recover damages from defendants in a case pending in the Superior Court of New Jersey. At the time he was retained, respondent already had been representing several other plaintiffs to enforce similar claims against the same defendants. Dr. Sackner paid respondent a $5,000 retainer. Respondent filed an amended complaint naming Dr. Sackner as an additional plaintiff. At some point during 1988 or 1989, Dr. Sackner met with some other plaintiffs at respondent's office to discuss recovery strategy. Thereafter, in December 1989, Dr. Sackner spoke with respondent regarding the progress of his case and learned that respondent's father had passed away. Apparently, respondent's father had fallen ill in January 1989, and ultimately died in July of that year. During their December 1989 conversation, respondent expressed remorse to Dr. Sackner over his father's death and told Dr. Sackner of the effect his father had on his life.

Dr. Sackner testified that, after that conversation, "things weren't progressing well with the case." He was not able to get much information on the case and had difficulty getting in touch with respondent. In addition, on one occasion when he was able to speak with respondent, the information obtained was false. Specifically, Dr. Sackner spoke with respondent in March 1990 and learned from respondent that the judge assigned to hear his matter had ordered the deposition of one of the defendants. He again telephoned respondent in late April, but was unable to speak with him. He, therefore, spoke to a secretary in respondent's office and asked whether the defendant's deposition had occurred. The secretary advised him that there was no record of the defendant's deposition having ever been scheduled. Dr. Sackner then called an attorney friend of his, James Gardner, who, on several prior occasions, had contacted respondent in Dr. Sackner's behalf to inquire about the status of his matter. He had done this at Dr. Sackner's specific requests because respondent had not returned many of Dr. Sackner's telephone calls. On one of the occasions that Gardner spoke with respondent, respondent advised him that he had filed a summary judgment motion to set aside an alleged fraudulent transfer made by one of the defendants to the other. Incident thereto, according to respondent, the judge had ordered the defendant's deposition in order to resolve certain factual issues. Respondent further advised Gardner that the deposition was about to be scheduled or had been scheduled.

At some point after Dr. Sackner learned that the deposition of the defendant had never been scheduled, Gardner himself investigated the status of Dr. Sackner's case. Since respondent did not return any of Gardner's telephone calls to him, Gardner called the Morris County Clerk's Office on May 17, 1990 and learned that the last docket entry on the matter was an order of dismissal. Gardner immediately drove to the clerk's office to personally review the file. He found that orders of summary judgment had been entered in behalf of both defendants on April 3, 1989 and May 16, 1989. He further found that the orders contained language indicating

that they were entered without opposition. The file contained no evidence of any motion for summary judgment to set aside the allegedly fraudulent transfer ever having been filed by respondent in Dr. Sackner's behalf. In fact, there was no activity reflected on the court file since the entry of the orders granting summary judgment in favor of the defendants.

After discovering the true status of Dr. Sackner's claim, Gardner immediately telephoned Dr. Sackner, who asked him to assume the handling of the matter in his behalf. Gardner then telephoned respondent and advised him of his discovery. Respondent expressed surprise and denied ever having received notice of the motions for summary judgment. Gardner, therefore, advised respondent that he would be filing a motion to set aside the judgments and that respondent should send him both a substitution of attorney and an affidavit about the lack of notice of the motions for summary judgment. Though respondent promised to both. call Gardner the following Monday and to send the above documents, he did neither. Gardner subsequently called the defendants' attorney and learned that he had in his possession proof of respondent's receipt in the form of signed certified receipt cards.

Ultimately, Dr. Sackner's case was re-opened and resulted in a small settlement ($30,000) in his behalf. While Dr. Sackner's original claim for relief was substantially higher ($275,000) than the amount for which the claim was settled, Gardner testified that respondent's failure to file a motion to set aside the allegedly fraudulent transfer between the defendants had not adversely affected or prejudiced that settlement.

At some point, Dr. Sackner filed a malpractice suit against respondent. Respondent subsequently entered into a settlement agreement, requiring him to pay Dr. Sackner's legal fees for Gardner's efforts to set aside the judgments entered in favor of the defendants. However, at the time of the DEC hearing, respondent had fallen behind on his payments to Gardner.

In addition, the complaint in the *Sackner* matter charged respondent with a violation of *RPC* 8.1(b), for failing to cooperate with the DEC. The evidence demonstrated that respondent had failed to reply to the DEC investigator's multiple requests for information on at least six occasions between September 1991 and July 1992. As a result, in July 1992, the Office of Attorney Ethics (OAE) filed an Order to Show Cause why respondent should not be temporarily suspended for failing to cooperate, and this Court sanctioned respondent in October 1992.

Respondent essentially admitted all of the factual allegations underlying the ethics complaint. However, he challenged their legal effect by asserting what he believed to be mitigating circumstances. He testified that he had failed to respond to the summary-judgment motions because at the time he had been experi-

encing psychiatric problems, which had been exacerbated by his father's terminal illness. Respondent noted that when he had received the motions he had intended to object to them, but had failed to do so because of the time he had been spending with his father on a daily basis and the support he had been providing to both his mother and his younger sister. However, respondent admitted that he had represented other clients diligently during that same period.

Respondent testified that he had lied to Dr. Sackner and Mr. Gardner because he had been embarrassed by his initial neglect and he had intended to file a motion to vacate the judgments. He explained that he had not asked any of his three associates to handle the matter because he had been too embarrassed and ashamed to do so. Similarly, respondent attributed his failure to respond to any of the DEC's requests for information to his embarrassment.

In support of his claim of psychological impairment, respondent submitted a report from his treating psychiatrist, Philip M. Werner, dated April 5, 1993. That report indicated that respondent had been a patient of Dr. Werner since 1985, and that from 1989 through the end of 1992, respondent "was under severe emotional stress that clearly was causally related to his difficulties responding to all of his responsibilities." Nevertheless, Dr. Werner found that respondent "seems to have recovered to more than a sufficient degree to allow him to perform in a professional and timely manner."

As of March 29, 1993, the date of the DEC hearing, respondent was taking Prozac, an antidepressant, and Valium, a sedative. Respondent testified that the "right combination of dosage and frequency" of those medications had modified his level of depression and anger, which enabled him to "grapple with not winning every case." Furthermore, respondent testified that he had hired a senior associate to ensure that the type of problem presented by Dr. Sackner's case would not reoccur and that he had become more comfortable with delegating responsibility.

## B

The DRB next summarized the relevant facts in the *Sprich* matter:

Respondent was retained by Edward and Carrie Sprich, on June 10, 1985, to defend them and to file a counterclaim in their behalf in a matter then pending in the Law Division, in Morris County. [T & J Custom Builders, Inc. filed the complaint against the Spriches.] Respondent filed an answer and a counterclaim on July 2, 1985. Thereafter, on August 5, 1985, the attorney for the plaintiff (defendant on the counterclaim) propounded interrogatories on respondent. Respondent acknowledged receipt of the interrogatories on August 6, 1985. Pursuant to the Rules of Court, answers to those interrogatories would have been due within sixty days. On November 12, 1985, plaintiff's counsel wrote to respondent to remind him that the interrogatory answers were overdue and to find out when the answers would be forthcoming. Respondent wrote to plaintiff's counsel, on November 18, 1985, to advise that he expected to have the answers within the next two weeks. On January 17, 198[6], when plaintiff's counsel did not receive the long-overdue interrogatory answers, he again wrote to respondent. That letter followed two previous telephone conversations with respondent, on January 2 and January 14, 1986, during which respondent promised to forward the interrogatory answers.

Thereafter, on or about February 5, 1986, plaintiff's counsel served respondent with a motion to strike the Spriches' answer and counterclaim for failure to serve answers to interrogatories. That motion was returnable on February 28, 1986. Respondent neither served answers to interrogatories nor opposed or otherwise replied to plaintiff's motion. On April 11, 1986, an order was entered striking the Spriches' answer and counterclaim for failure to serve answers to interrogatories. Thereafter, on June 23, 1986, plaintiff's attorney filed a motion, returnable on July 3, 1986, requesting entry of final judgment by default against the Spriches. Although that motion was addressed to and served upon respondent, he did not reply to the motion. On July 30, 1986, final judgment by default was entered against the Spriches, in the amount of $61,694.32 plus costs.

Approximately eighteen months later, on January 22, 1988, respondent filed a motion to vacate the default judgment and to dismiss the complaint. In support of that motion, respondent asserted that the indebtedness, which formed the basis of plaintiff's complaint, was void and unenforceable under the provisions of the Secondary Mortgage Law Act. In his brief, respondent acknowledged that his clients had failed to answer interrogatories. Respondent's motion, which was opposed by plaintiff's counsel, was denied on March 29, 1988. Subsequently, plaintiff's counsel made routine collection efforts, which included taking an assets deposition of the Spriches on March 8, 1989. Respondent attended that deposition as the Spriches' counsel. Ultimately, respondent was discharged as counsel, after his firm assisted the Spriches in entering into a settlement agreement with the plaintiffs.

The complaint in the *Sprich* matter also charged respondent with failing to cooperate with the DEC, in violation of *RPC* 8.1(b). The evidence demonstrated that the DEC had notified respondent of the charges in September 1991, but he had failed to cooperate until approximately one year later, when he faced an impending sanction from this Court.

Respondent essentially admitted all of the allegations in the complaint, but maintained that his decision not to oppose the various motions had been justified. He testified that he really had no defense to the motion to strike the Spriches' pleadings because they had never fully cooperated in providing answers to interrogatories. Respondent stated that although Mr. Sprich had answered some of the interrogatories, he had left respondent to answer the remainder by retrieving information from "unorganized" files, checks, and bills. Respondent maintained that he had had several conversations with Mr. Sprich about the necessity of completing the interrogatories and that Mr. Sprich repeatedly had promised to "get [him] the information." Although the Spriches had provided respondent with "draft" answers to the interrogatories, respondent testified that he had never received sufficient information to complete fully the interrogatories.

In support of his assertion that his clients had not cooperated with him to complete the interrogatories, respondent produced a letter he had written to Mr. Sprich, dated September 30, 1985. In that letter, respondent reminded his client that he had failed to appear at respondent's office two weeks earlier to answer interrogatories and had failed to pay additional sums towards his retainer. The letter also stated that respondent had "withheld actively being involved in this case based upon [Mr. Sprich's] failure to meet [his] financial obligations to [respondent's] office." The letter advised Mr. Sprich that it was "time for this matter to either be aggressively attended to or abandoned."

Moreover, respondent testified that he had not opposed the motion to strike the pleadings because Mr. Sprich essentially had lost interest in the matter. According to respondent, he advised

Mr. Sprich of the pending motion during a face-to-face conversation, and urged him to make further payments towards respondent's retainer from the settlement proceeds of another case respondent had handled for him. Respondent testified that Mr. Sprich had declined to make any further payments out of the settlement proceeds, and had advised respondent to "put [the case] over" to "buy [him] time." Respondent believed that he had the motion adjourned once, although he had no documentation to support that contention.

Finally, respondent testified that he had not opposed the motion for entry of a default judgment because the Spriches basically had lacked any defense to plaintiff's suit. That was so, he asserted, because he had learned from plaintiff's attorney that years before, in 1980, the Spriches had executed a release in favor of plaintiff.

Although respondent and Mr. Sprich disagreed about whether respondent had advised Mr. Sprich that a motion to strike the pleadings had been filed, both agreed that respondent had notified Mr. Sprich that a default judgment had been entered. When the Appellate Division later issued an opinion in an unrelated matter that supported the Spriches' original defense and counterclaim, respondent filed the motion to set aside the default judgment, which was denied.

While the original ethics complaint contained no such allegations, the complaint was amended at the DEC hearing to allege that respondent had failed to file an appeal of the denial of the motion to set aside the default judgment. The answer was similarly amended to deny that respondent had been retained to file an appeal. Essentially, Mr. Sprich testified that he had retained respondent to appeal the denial of that motion. In support of his assertion, he produced a canceled check dated May 2, 1988, payable to respondent, in the amount of $325.00. "D.P. T & J Appeal" was written in the memo portion of that check, apparently indicating Mr. Sprich's intention to make a down payment for the appeal. Mr. Sprich testified that he had personally handed that check to respondent in his office.

Respondent maintained that although the check had been endorsed by someone in respondent's name and had been deposited into his account, he did not endorse the check and, in fact, could not recall seeing it. Respondent believed that his bookkeeper had endorsed the check. He testified that had he received or seen that check, he would not have accepted it, given the fact that the amount would not even cover the costs associated with filing the notice of appeal, much less any fee, and that it was apparently tendered only ten days before the time to appeal would expire.

We note that in the subsequent deposition of the Spriches, Mr. Sprich did not deny or otherwise react to plaintiff's attorney's statement to him that no appeal of the denial of the motion to set aside the default judgment had been filed and that the time to do so had expired. Furthermore, despite Mr. Sprich's claim that respondent had failed to file an appeal in his behalf, he continued to employ respondent's services, or those of respondent's firm, throughout the post-judgment proceedings, which included not only the assets deposition, but also a motion for a wage execution and, ultimately, a settlement agreement.

## C

Finally, the DRB summarized the relevant facts in the *Inter-Tel* matter:

Sometime in 1989 or 1990, respondent was retained by Barry Wichansky, Vice-President of Inter–Tel, Inc., to perform collection services. No written retainer agreement was executed or prepared, despite the fact that respondent agreed to provide services on a contingency basis. Specifically, respondent would work on a contingency fee of twenty-five percent of the amount collected. While the presenter took the position that respondent's failure to enter into a written fee agreement certainly caused the client some confusion as to its responsibilities (for example, respondent and Mr. Wichansky disagreed on the nature and extent of Inter–Tel's obligation to reimburse respondent for costs), the presenter specifically excluded from the complaint any allegation of a violation of *RPC* 1.5(c), because he believed that the issue should more properly be presented to a fee arbitration committee.

In any event, in connection with his representation, respondent prepared and forwarded to Inter–Tel monthly status reports that essentially summarized the status of collection efforts on specific accounts. Respondent's services were apparently satisfactory to Inter–Tel until August 1991, when Mr. Wichansky's

assistant, Nancy Bialos, complained to respondent of discrepancies in the status reports, as well as the apparent inactivity of several accounts for several months. Ms. Bialos wrote to respondent on several occasions, between August and November 1991, and raised specific questions on several accounts. Ms. Bialos received no response to any of those letters until January 30, 1992. On that date, respondent's associate wrote to Ms. Bialos and advised her of certain cases that had been closed and the reason therefor. Ms. Bialos apparently did not consider that letter to be completely responsive to her earlier inquiries. She, therefor, wrote to respondent's associate on March 19, 1992, again asking for responses to her earlier letters to respondent. Thereafter, additional correspondence ensued from Ms. Bialos and Mr. Wichansky to respondent, requesting essentially the same information as that previously requested by Ms. Bialos on several prior occasions.

While it is not clear whether Mr. Wichansky discharged respondent or whether respondent asked Mr. Wichansky to seek other counsel, the relationship between respondent and Inter–Tel was terminated by May or June 1992. Thereafter, Inter–Tel's new attorney, Philip Levitan, wrote to respondent on June 22, 1992, requesting that respondent forward to him the Inter–Tel files, along with substitutions of attorney and an accounting of amounts due to or collected in behalf of Inter–Tel. When respondent did not reply to that letter, Levitan followed up with another letter, dated July 1, 1992. By letter dated July 16, 1992, respondent advised Levitan that he expected to have all of the "ninety-seven-some-odd" files together and ready for transmittal to him shortly. By August 24, 1992, five weeks later, respondent still had not forwarded anything to Levitan. Finally, on October 20, 1992, respondent forwarded to Levitan a copy of his ledger sheets and bills to Inter–Tel. In that letter, he asserted that Inter–Tel owed him $300.00 and inquired of Levitan how his fee would be protected. He further advised Levitan that he would send substitutions of attorney on each of the cases under separate cover.

On November 10, 1992, Levitan again wrote to respondent, agreeing to protect his fee and requesting that respondent forward the files to him, particularly the [Concord] and [Ellman] files. Levitan testified that he had requested those two more substantial files back in June 1992. It was not until December 4, 1992 that respondent forwarded to Levitan those two files. The remainder of the files were never forthcoming.

Levitan testified that respondent seemed to have invested a substantial amount of work in both the Concord and Ellman files. In fact, one of those files was completely worked up by respondent for trial.

Respondent testified that he had stopped sending monthly reports to Inter–Tel after August 1991 because the associate and the administrative personnel who had been handling the Inter–Tel files had left his firm. Furthermore, in February 1992, the associate to whom respondent had subsequently assigned the Inter–Tel matters advised respondent that he would no longer perform that work. Therefore, respondent advised Mr. Wichan-

sky that his firm could no longer handle Inter–Tel's collection matters.

Respondent gave several reasons to explain the delay in forwarding the files to Inter–Tel's new attorney. Essentially, respondent testified that he had been busy running a business, that his bookkeeper had needed time to calculate the costs due him, that many of the files to be forwarded had been closed, that he had been asserting a retaining lien on the files, and that no one had pressed him for copies of any of the files, with the exception of *Concord* and *Ellman.*

## II

The DRB found "respondent's conduct in the *Sackner* matter to be particularly egregious." It determined that respondent had failed to keep Dr. Sackner advised of the status of his matter and to comply promptly with his reasonable requests for information, in violation of *RPC* 1.4(a). It also found that respondent had violated *RPC* 8.4(c) by engaging in a pattern of misrepresentation to Dr. Sackner and to his new attorney, Mr. Gardner. The DRB further determined that respondent had violated *RPC* 8.1(b) by failing to cooperate with the DEC for over one year.

Finally, although the DEC made no such specific finding, the DRB concluded that respondent had grossly neglected the *Sackner* matter, thereby violating *RPC* 1.1(a), by failing initially to reply to the summary-judgment motions, as well as failing to move to set aside the orders granting summary judgment at any time after their entry. The DRB found that "the DEC's rejection of respondent's affirmative psychiatric defense was proper." It emphasized that "[b]y respondent's own admission, his alleged problems did not prevent him from effectively attending to the matters of other clients."

With respect to the *Sprich* matter, the DRB rejected the DEC's finding of unethical conduct, with the exception of failing to cooperate with the DEC, in violation of *RPC* 8.1(b). Specifically, the DRB disagreed with the DEC's conclusion that respondent

had acted unethically by failing to advise Mr. Sprich of the pending motions to strike the pleadings and for default judgment prior to the entry of orders granting that relief. The DRB reasoned that

> [w]hile both respondent and Mr. Sprich agreed that respondent advised Mr. Sprich, after the fact, that the motion for entry of judgment of default had been granted, there was no such agreement in their testimony with respect to similar advice before the entry of any orders, each taking opposite positions. Simply stated, the Board could not make a fair credibility assessment of the witnesses' testimony vi[s]-a-vis both one another and the balance of the evidence.

Accordingly, the DRB recommended the dismissal of all charges relating to the *Sprich* matter, with the exception of the violation of *RPC* 8.1(b).

In the *Inter–Tel* matter, the DRB accepted the DEC's finding that respondent had failed to keep his client informed and had failed to respond to his client's reasonable requests for information, in violation of *RPC* 1.4(a). However, it rejected the DEC's findings that respondent had committed ethical violations because he had failed to forward the client files to the new attorney and had failed to provide an accounting to that attorney on termination of his representation.

> Addressing the failure to forward the files, the DRB found that respondent was asserting a retaining lien over his client's files. The record is totally devoid of any indication that anyone suffered any prejudice by virtue of respondent's failure to return the files. In fact, respondent testified that most of those files were closed. In addition, respondent forwarded to Levitan the two original files about which the client was primarily concerned, albeit several months later. He appears to have asserted the lien properly—at least in the technical sense.

Although the DRB was "disturbed" that respondent had asserted a lien in this matter because the dispute might have been caused, in part, by respondent's failure to reduce to writing his contingent-fee arrangement, as required by *RPC* 1.5(c), it concluded that that failure did not rise to the level of an ethics violation in this case.

Furthermore, the DRB concluded that respondent had indeed provided an accounting to Mr. Levitan, albeit four months after Mr. Levitan's original request. In fact, based on the volume of Inter–Tel files that respondent had been required to prepare for

transfer to Mr. Levitan, the DRB did not find significant the four-month delay in submitting the accounting.

Based on our independent review of the record, we conclude that the DRB's findings of unethical conduct are established by clear-and-convincing evidence. Specifically, we find that in the *Sackner* matter, respondent violated *RPC* 1.1(a) (prohibiting lawyer from handling matter in grossly negligent manner), *RPC* 1.4(a) (requiring lawyer to keep client reasonably informed about status of matter and to comply promptly with reasonable requests for information), *RPC* 8.1(b) (requiring lawyer to respond to lawful demand for information by disciplinary authority), and *RPC* 8.4(c) (prohibiting lawyer from engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation). We adopt the DRB's recommendation to dismiss all charges relating to the *Sprich* matter, except for the violation of *RPC* 8.1(b), which is supported in the record by clear-and-convincing evidence. Finally, with respect to the *Inter–Tel* matter, we accept the DRB's recommendation to dismiss all charges, except for the violation of *RPC* 1.4(a), which is fully supported by the record.

## III

In addressing the nature and extent of appropriate discipline, the DRB determined that there were no mitigating factors, and characterized respondent's defense based on his history of psychiatric problems as "incredible." The DRB found as aggravating factors that respondent had cooperated with the DEC only after the OAE had moved before this Court for his temporary suspension and that respondent had twice been the subject of prior discipline for virtually identical misconduct. The DRB unanimously recommended that respondent be suspended for one year, that he be required to submit proof of fitness to practice law prior to reinstatement, and that he be required to practice under the supervision of a proctor for two years on readmission. We agree with the DRB's recommended disposition.

We emphasize that we share the DRB's concern about "respondent's apparent disregard for the truth" demonstrated in the *Sackner* matter. When an attorney falsely represents to a client that his or her case is proceeding smoothly, public confidence in the bar is undermined. *In re Cohen*, 120 *N.J.* 304, 306, 576 *A.*2d 855 (1990). Clients must not "suffer the consequences of being told their case [is] under control when it [is] not." *In re Goldstein*, 97 *N.J.* 545, 549, 482 *A.*2d 942 (1984). Respondent misrepresented to Dr. Sackner and Mr. Gardner the status of the matter on at least three separate occasions. Even when Mr. Gardner confronted him with information regarding the true status of the matter, respondent continued to misrepresent. Such misrepresentations by an attorney are intolerable.

Moreover, we agree with the DRB's decisions to reject respondent's defense in the *Sackner* matter based on his history of psychiatric problems and to decline to find his psychiatric condition as a mitigating factor in determining an appropriate sanction. We have acknowledged that " 'there may be circumstances in which an attorney's loss of competency, comprehension, or will may be of such a magnitude that it would excuse or mitigate conduct that was otherwise knowing and purposeful.' " *In re Bock*, 128 *N.J.* 270, 273, 607 *A.*2d 1307 (1992) (quoting *In re Goldberg*, 109 *N.J.* 163, 168, 536 *A.*2d 224 (1988)). However, adequate proof that the underlying disability was so severe as to excuse or mitigate the ethical violation must be produced. We previously have evaluated an attorney's misconduct by determining whether he had "known that what he was doing was unethical and improper, and that he could have refrained or desisted from doing what he did." *In re Yaccarino*, 117 *N.J.* 175, 196, 564 *A.*2d 1184 (1989).

In this case, Dr. Werner's report stated that from 1989 through the end of 1992, respondent "was under severe emotional stress that clearly was causally related to his difficulties responding to all of his responsibilities." However, the record contains "no psychiatric evidence that respondent was at any time out of

touch with reality or unable to appreciate the ethical quality of his acts." *In re Bock, supra,* 128 *N.J.* at 273, 607 *A.*2d 1307. Although respondent might have been suffering from depression when he lied to Dr. Sackner and Mr. Gardner, there is no evidence that he lacked the ability to understand the nature of his acts. Accordingly, we agree with the DRB's determination that respondent's psychiatric history neither excused nor mitigated his conduct.

Respondent's case is further aggravated by his flagrant violations of *RPC* 8.1(b). "[A]n attorney has a duty to cooperate with the disciplinary committees." *Cohen, supra,* 120 *N.J.* at 307, 576 *A.*2d 855; *see also In re Grinchis,* 75 *N.J.* 495, 496, 384 *A.*2d 137 (1978) (finding that "[d]isrespect to an ethics committee agent constitutes disrespect to this Court"). Respondent failed to fulfill that duty in connection with the investigations of the *Sackner* and *Sprich* matters. In both of those matters, the DEC first advised respondent of the grievance in September 1991, and repeatedly requested information pertaining to those matters in the following months. Those requests repeatedly were ignored by respondent. Respondent's continued indifference required the OAE, on July 19, 1992, to file with this Court an Order to Show Cause why respondent should not be temporarily suspended. Faced with that sanction, on September 25, 1992, respondent finally filed an answer in the *Sackner* matter and wrote a letter to the DEC's investigator offering his cooperation in the *Sprich* matter. (Respondent finally filed an answer in the *Sprich* matter on January 8, 1993.) Although the OAE thereafter withdrew its petition for immediate temporary suspension on October 7, 1992, this Court nevertheless ordered respondent to pay a $1,000 fine as a penalty for his inexcusable indifference.

We further note that two times previously we have determined that respondent committed ethical violations involving similar misconduct. Respondent received a private reprimand in 1978 for failing to apprise his client about the status of his suit. In that case, the client also experienced unnecessary difficulty in commu-

nicating with respondent. Respondent also has received a public reprimand, *In re Trueger*, 92 *N.J.* 605, 458 *A.*2d 1276 (1983), for ethical violations in two different matters. In the first matter, respondent neglected a civil suit, which led to its dismissal, and then failed to inform his client of the dismissal and the terms for reinstatement until long after the dismissal had been entered. Respondent also failed to respond to repeated inquiries from his client. In the second matter, respondent failed to complete and serve interrogatories, which eventually resulted in an entry of judgment against his client. After the client had consulted another attorney, respondent misrepresented the status of the matter to that attorney.

In sum, those prior ethical violations, along with the present ethical violations, demonstrate that respondent has repeatedly "failed to meet his professional responsibilities," *Cohen, supra*, 120 *N.J.* at 307, 576 *A.*2d 855, and therefore the Court must act to protect the public. Respondent testified that he had hired new personnel and had instituted new office procedures and safeguards since his neglect and misrepresentations in the *Sackner* matter. After his public reprimand in 1983, respondent promised to implement similar changes. In our view, respondent's repetitive misconduct, in combination with his inexplicable failure to cooperate with the DEC, requires significant discipline. Accordingly, we adopt the DRB's recommendation and suspend respondent from the practice of law for one year. We further require respondent to submit proof of fitness to practice law prior to reinstatement and to practice under the supervision of a proctor for two years upon readmission. Subject to the approval of the OAE, an attorney affiliated with respondent in the practice of law may be designated as proctor.

Respondent shall reimburse the Disciplinary Oversight Committee for appropriate administrative costs.

*For suspension—*

Chief Justice WILENTZ and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—7.

*Opposed*—None.

## ORDER

It is ORDERED that **HOWARD C. TRUEGER** of **PARSIP-PANY,** who was admitted to the bar of this State in 1971, is hereby suspended from the practice of law for a period of one year, effective June 1, 1995, and until the further Order of the Court;  and it is further

ORDERED that respondent be restrained and enjoined from practicing law during the period of his suspension and that he comply with *Rule* 1:20–20 governing suspended attorneys;  and it is further

ORDERED that prior to reinstatement to practice respondent provide proof of his fitness to practice law and that on reinstatement he practice under the supervision of a practicing attorney approved by the Office of Attorney Ethics for a period of two years and until further Order of the Court;  and it is further

ORDERED that respondent reimburse the Disciplinary Oversight Committee for appropriate administrative costs incurred in the prosecution of this matter.