714 A.2d 243

IN THE MATTER OF JOEL GREENBERG,
AN ATTORNEY AT LAW.

Argued September 23, 1997—Decided July 17, 1998.

*Michael J. Sweeney*, Deputy Ethics Counsel, argued the cause on behalf of the Office of Attorney Ethics.

*Joseph H. Kenney* argued the cause for respondent (*Kenney & Kearney*, attorneys; *William J. DeSantis*, on the brief).

*Jay H. Greenblatt* argued the cause for amicus curiae, New Jersey State Bar Association (*Wilentz, Goldman & Spitzer*, attorneys; *Mr. Greenblatt* and *Frederick J. Dennehy*, of counsel; *Mr. Greenblatt, Mr. Dennehy* and *Megan K. Gajewski*, on the brief).

PORITZ, C.J.

This matter is before the Court for review pursuant to *R.* 1:20–16(a) of a decision of the Disciplinary Review Board ("DRB") recommending that respondent, Joel A. Greenberg, be disbarred. Based on information provided by Greenberg and on its own investigation, the Office of Attorney Ethics ("OAE") filed a formal complaint against respondent, alleging violations of *Rule of Professional Conduct* 8.4(c) (*"RPC"*), conduct involving dishonesty, fraud, deceit, and misrepresentation. The complaint asserted that, during a sixteen-month period in 1992–1993, respondent fraudulently obtained law firm funds for his own personal use. Before the Special Ethics Master appointed to hear the matter for the District XIV Ethics Committee, Greenberg asserted that he "suffer[ed] from a mental illness which deprived him of the ability to comprehend what he was doing and the will to prevent it." The Special Ethics Master, and later the DRB, found that respondent had not demonstrated "by competent medical proofs that [he] suffered a loss of competency, comprehension or will of a magnitude that could excuse egregious misconduct that was clearly knowing, volitional and purposeful." *In re Jacob,* 95 *N.J.* 132, 137, 469 *A.*2d 498 (1984).

We find that Joel A. Greenberg knowingly caused his firm to disburse monies to him that belonged to the firm without the consent of his law partners and that he knowingly misappropriated fees due the firm to his own use. We reaffirm the rule set forth in *In re Wilson,* 81 *N.J.* 451, 409 *A.*2d 1153 (1979), and extended in *In re Siegel,* 133 *N.J.* 162, 627 *A.*2d 156 (1993), that misappropriation of client or law firm funds will almost invariably result in disbarment. We hold that disbarment is warranted in this case.

# I

Joel A. Greenberg was licensed to practice law in New Jersey from 1975 until September 22, 1993, when he consented to the temporary suspension of his license. At the time of his suspen-

sion, Greenberg was a partner with Horn, Goldberg, Gorny, Daniels, Paarz, Plackter & Weiss ("Horn, Goldberg" or "the firm") in Atlantic City. Greenberg primarily represented health-care providers in medical malpractice actions.

In June 1991, Greenberg received a referral from Rochlin & Settleman, a Maryland law firm, and accepted the representation of Charles and Theresa Harrison in the matter of *Harrison v. Cairn.* When Greenberg settled the matter for a total of $42,500, he requested two checks from the insurance company, one for $35,000 made payable to the Harrisons and one for $7500 made payable to Greenberg personally. The insurance company refused and, instead, issued two checks for $21,250 payable to both Greenberg and the Harrisons. Rather than depositing the checks in the firm's trust account and issuing a firm check to the Harrisons, Greenberg endorsed the checks and forwarded them to the Harrisons accompanied by a request that they return a check in the amount of $7500 made out to him. When the Harrisons complied, Greenberg kept the fee without the authorization or knowledge of his law firm.

When Rochlin & Settleman subsequently sought a referral fee, Greenberg presented a check request to the firm bookkeeper, dated June 25, 1992, in the amount of $3000 payable to Rochlin & Settleman. On the request form, Greenberg indicated that the check was needed for the "reimbursement of expert fees pursuant to Court Order—Dr. Flynn." In the transmittal letter accompanying the request form, Greenberg explained that the check was for "reimbursement of expert testimony" in the matter of *Pasquale v. Schwing.*

Thereafter, from August 1992 until August 1993, Greenberg obtained an additional $27,025 in law firm funds for his personal use without the firm's knowledge or consent. The method he used was simple: he submitted a series of false disbursement requests to the firm's bookkeeping department. Respondent would either instruct a secretary that he needed a law firm check or dictate the check request on tape, after which an expense account voucher

would be prepared and signed, either by Greenberg himself or by a secretary on his behalf. In support of the check request, Greenberg would also prepare a transmittal letter addressed to the payee. Once Greenberg received the firm checks, he would endorse them and retain the funds for his personal use or deposit them in the corporate checking account of Southern Shore Medical Supply ("SSMS"), an entity incorporated by Greenberg in December 1992. Respondent submitted eight such similarly structured requests in the twelve months preceding and up to August 17, 1993.

Three of the false disbursement requests made by Greenberg were sought as payment to local physicians. On August 31, 1992, Greenberg presented an expense voucher in the amount of $2000 payable to Dr. Denay Marino, along with a transmittal letter explaining that the check constituted payment for a deposition fee; on December 14, 1992, Greenberg submitted a check request in the amount of $2500 payable to Dr. Alan Forman, purportedly in payment for expert testimony; and, on July 23, 1993, Greenberg requested a check in the amount of $1875 payable to Dr. Glen Budnick for expert fees. Greenberg endorsed the Marino and Forman checks by forging the physicians' signatures. Because his wife worked part-time for Dr. Budnick at home, Greenberg had access to the Doctor's business stamp, which he used to endorse the Budnick check without Budnick's or his wife's knowledge or consent. In all three cases, Greenberg kept the funds for his own personal use.

Greenberg also requested a check made out to the bank holding his mortgage. On September 14, 1992, Greenberg requested $2900 payable to Investor Savings, with the submitted purpose of paying the State Division of Taxation in the matter of the estate of his uncle, Stanley Greenberg. Instead, respondent sent the check to Investor Savings to cover three months of mortgage payments on his home.

Greenberg made four additional fraudulent check requests during this period, each for payment to SSMS. At the District Ethics

hearing, Greenberg denied that SSMS was "a fictitious corporation" set up for the purpose of laundering the Horn, Goldberg checks.[1] He claimed that he incorporated SSMS with his wife and a third person as a legitimate business for the sale of medical supplies to physicians. He conceded, however, that the business was not a client of the firm, was dormant, and that, aside from "minimal transactions" of which there is no proof in the record, "it's [sic] business activity consisted of—of accepting these payments and in turn paying them out" to respondent.

The record discloses that Greenberg established a corporate checking account for SSMS in the spring of 1993, just prior to making his first check request payable to the corporation. By requests dated May 20, May 28, and June 17, 1993, Greenberg received, endorsed, and deposited SSMS checks in the amounts of $1750, $3500, and $12,500, respectively. Though the initial bank statement for the SSMS account is not available, the bank statement for May 28, 1993 through June 30, 1993 shows that the $12,500 check was deposited and that the account balance at that time was $12,821.65. The June 30 statement also shows that Greenberg issued two checks on this balance: one for $3750 payable to himself on June 18, 1993, and one for $9000 payable to Investor Savings on June 22, 1993, noting in the memo portion of the check that it was intended to cover his May, June, and July mortgage payments.

By mid-June, Greenberg had fraudulently obtained $34,525 that belonged to his law firm. Then, on August 17, 1993, he made his final check request payable to SSMS in the amount of $23,500. The transmittal letter indicated that the disbursement was the "final installment" for the purchase by Sawyer Electric, a firm client, of an interest in SSMS. This time William Colavito, the firm's Chief Financial Officer, questioned Greenberg about his request. Respondent explained that the disbursement was to be

---

[1] Greenberg did not testify at the district ethics hearings. These representations were made by his counsel in the course of the proceedings.

counted against a $90,000 retainer from Sawyer Electric placed in the Horn, Goldberg business account earlier that year. When pressed on how the transaction could be charged against firm funds, Greenberg said, "If anyone ever found out about this I would be disbarred." Colavito reported the conversation to the firm's managing partner, Jack Plackter, who subsequently met with Greenberg. The firm reviewed respondent's check requests for the prior six months and discovered the three SSMS disbursements with his endorsements, but apparently took no action.

Three weeks later, on September 11, 1993, Greenberg approached friend and attorney Paul D'Amato during a function at respondent's synagogue. The two men retired to the parking lot for privacy where, D'Amato reports, Greenberg began to cry and shake, saying to his friend, "I don't know what I'm doing. You got to help me." D'Amato agreed to help, but Greenberg would not explain what was wrong. D'Amato found Greenberg's wife, who promised to have Greenberg meet D'Amato at his office the following morning.

At D'Amato's office the next day, Greenberg admitted that he had taken law firm funds. He told D'Amato that he could not remember when it started or how much he had taken but did mention an accident case and illegitimate vouchers. When he huddled in a corner crying, D'Amato called another friend and attorney, Ed Goldstein, to help him with respondent. As Greenberg calmed, he said, "[G]et me away from the practice of law. I don't think I know what I'm doing anymore."

Greenberg gave D'Amato permission to call his partners and, later that afternoon, three Horn, Goldberg partners met with Greenberg and D'Amato at D'Amato's office. At that point, however, Greenberg was incoherent and could not discuss the matter. D'Amato also called psychiatrist Dr. Norman S. Chazin to obtain treatment for his friend. Greenberg began meeting with Dr. Chazin the following day. With Greenberg's permission, D'Amato contacted the OAE on September 14, 1993, and the Atlantic County Prosecutor's Office on September 17, 1993. No

charges were filed by the firm or the prosecutor. Respondent made full restitution to the firm. On September 22, 1993, he entered into a consent order temporarily suspending his license.

## II

The OAE filed a formal complaint against Greenberg on January 13, 1995. During four days of hearings in November 1995 and January 1996 before a Special Ethics Master, Greenberg presented the testimony of his wife, friends, fellow attorneys, and two expert witnesses, Dr. Chazin and Dr. Gary Michael Glass. The OAE offered the testimony of Dr. Robert Sadoff.

Family, friends, and fellow attorneys testified to Greenberg's reputation in his community and to changes in Greenberg's personality from as early as August 1990 up to August 1993. Many vouched for Greenberg's excellent reputation and unquestioned integrity. He was perceived as an outgoing, friendly man who was known to participate in many community activities, including Margate City Little League and his synagogue.

There was also testimony by Paul D'Amato that, as early as August 1990, Greenberg appeared negative and lethargic and stopped answering telephone calls and interrogatories in a timely manner. Joseph Sayegh, another boyhood friend and attorney, noticed similar changes:

> He always was an optimistic person. He always had a sense of humor. He was always kind. He always made a connection with people.... And it was gone.... I mean this was not a guy having a bad day.... There was something wrong with him.

David Goldberg, friend and neighbor, testified that Greenberg, once active in the community, had stopped socializing. A. Michael Barker, a fellow partner, observed that Greenberg began to keep his office door closed, "was withdrawn and ... there was some despondency." Greenberg's wife testified to difficulties at home during this period.

Dr. Chazin, Greenberg's treating physician and first expert witness, testified that respondent suffered from dysthymia, a

chronic, low-grade form of depression, which he attributed to "childhood developmental issues and [a] family history of depression." Dr. Chazin also diagnosed Greenberg with major depression and opined that, due to his condition, Greenberg "did not have the requisite intent to steal from his law firm." Instead, Greenberg's actions constituted a desperate attempt "to keep himself from ego disintegration." In Dr. Chazin's view, Greenberg "was not delusional, . . . did not suffer from hallucinations or show any sign of psychosis[, and] . . . was not 'McNaughten' insane," though he remembered little about his acts of misappropriation and lacked "any conscious appreciation" of the self-destructiveness of his behavior. At the time of the hearing, however, Dr. Chazin reported that Greenberg was fully recovered, unlikely to repeat his antisocial behavior, and ready to return to the practice of law.

Dr. Glass, Greenberg's second expert witness, diagnosed Greenberg with dysthymia and adjustment disorder with depression, or major depression. Dr. Glass agreed with Dr. Chazin that Greenberg did not possess the requisite intent to "knowingly misappropriate or steal" from the firm, explaining his behavior as an unconscious cry for help:

> At some level Joel Greenberg was aware that he was doing this because, as I said before, he did it and he behaved. I mean he didn't just take the money and make a paper airplane and throw it out the window. Yet, on the other hand, the behavior was so odd . . . without motivation, without attempt to secrete [sic] his behaviors, without attempt to pursue the behaviors in a way that will get him greater gain. . . .

Dr. Glass agreed that Greenberg was not delusional or "McNaughten" insane, that he knew the difference between right and wrong. However, when asked whether Greenberg lacked "comprehension, competency or will," Dr. Glass responded equivocally:

> I'm not sure whether it falls under it, what the right answer is. I believe that he was not functioning with competence and will. The will was for Mr. Greenberg to punish Mr. Greenberg. The will was not to hurt the law firm . . ., not to hurt clients. The will was a cry for help.

Dr. Sadoff, testifying on behalf of the OAE, agreed with Drs. Chazin and Glass that Greenberg suffered from major depression,

was not delusional, and was not "McNaughten" insane. With respect to how depression affected Greenberg, Dr. Sadoff differed:

> He had a depression. His depression affected him in a number of ways, but, as I indicated, not selectively, not cognitively in the sense that he could not know what he was doing or be aware of the implications of the behavior that he engaged in. He was able to try cases and try them successfully. He knew the outcome. He knew how to go about doing what he had to do. He was active in the community in doing things in other areas of his life.... I just don't know of any mental illness that would deprive him of his cognitive functions in this particular area and not globally, not across the board. There's just no such illness.

Dr. Sadoff specifically disagreed with Dr. Glass's comparison between Greenberg's actions and the actions of a driver who, upon arriving home, has no recollection of the decisions made to get there, distinguishing between Greenberg's complicated acts of misappropriation and "the kind of rote, automatic behavior performed on a daily basis that one could dissociate from and be so preoccupied as to not remember." Rejecting the possibility that Greenberg's depression caused selective amnesia or dissociation, Dr. Sadoff concluded that respondent's condition did not deprive him of knowledge of what he was doing or of the ability to control his behavior. Dr. Sadoff agreed, however, that it was unlikely Greenberg would engage in misappropriation again.

### III

At the conclusion of the hearing, the Special Ethics Master found that Greenberg had "engaged in multiple acts of taking funds" from Horn, Goldberg, "without the authorization or knowledge of members of the firm," resulting in fraudulently obtained disbursements of $27,025[2] used by Greenberg for his own purposes. Based on our decision in *Siegel, supra,* 133 *N.J.* at 170, 627 *A.*2d 156, wherein we held that "knowingly misappropriating funds—whether from a client or from one's partners—will generally result in disbarment," the Special Master framed the issue

---

[2] This amount does not appear to include the $7500 fee Greenberg obtained from the Harrisons and kept for himself without his law firm's consent. *See supra* at 141, 714 *A.*2d at 245.

before her as "whether or not Joel Greenberg 'knowingly' misappropriated money from partnership funds ..., or whether any psychiatric condition existed which precluded his ability to 'knowingly' engage in acts of misappropriation." She found that Greenberg had not demonstrated "the magnitude of illness, impairment of judgment or severity of disability ... [necessary] to provide mitigation or defense" for his acts of misappropriation and recommended disbarment.

The DRB, like the Special Master, asked whether Greenberg "knowingly" committed acts of misappropriation, *i.e.*, whether Greenberg "took the funds knowing that they were not his ... and knowing that the taking was unauthorized." Because Greenberg's experts "focused on motive, as opposed to intent," the DRB relied on testimony that Greenberg was aware he was taking money that was not his, and that his taking was unauthorized by the parties to whom the money belonged. A four-member majority of the Board also recommended disbarment.

## IV

### A

By leave of the Court, the New Jersey State Bar Association ("NJSBA" or "Bar") has participated in this case as *amicus curiae*. The NJSBA has asked us to reexamine the rule of *Wilson, supra*—that "generally" where an attorney has knowingly misappropriated clients' monies "disbarment is the only appropriate discipline." 81 *N.J.* at 453, 409 *A.*2d 1153. In the Bar's view, the Court has consistently applied *Wilson* as a "strict liability" rule despite language in our decisions suggesting that, in appropriate cases, disbarment would not be automatically imposed.

We acknowledge the correctness of the Bar's observation that, since *Wilson*, the Court has consistently and unwaveringly disbarred attorneys who knowingly took their clients' funds. *In re Noonan*, 102 *N.J.* 157, 160, 506 *A.*2d 722 (1986); *see also In re Hollendonner*, 102 *N.J.* 21, 28–29, 504 *A.*2d 1174 (1985) (holding

"parallel" between escrow and client funds requires application of *Wilson* rule in cases involving knowing misuse of escrow funds). "Since this Court announced the bright-line *Wilson* rule in 1979, 'we have not retreated one bit from the principle that knowing misappropriation ... will warrant the *Wilson* sanction of disbarment,' *In re Konopka,* 126 *N.J.* 225, 228, 596 *A.*2d 733 (1991), and have repeatedly rejected opportunities 'to create exceptions to the *Wilson* rule, even where the misappropriation was the product of severe personal and financial hardship,' *In re Warhaftig,* 106 *N.J.* 529, 535, 524 *A.*2d 398 (1987)." *In re Roth,* 140 *N.J.* 430, 444, 658 *A.*2d 1264 (1995). Although we have recognized that "[t]he *Wilson* rule is harsh," *In re Barlow,* 140 *N.J.* 191, 195, 657 *A.*2d 1197 (1995), we remain "convinced that nothing less will be consistent with our view of the devastating effect of misappropriation on the public's confidence in the bar and in this Court," *Roth, supra,* 140 *N.J.* at 444, 658 *A.*2d 1264 (quoting *In re Hahm,* 120 *N.J.* 691, 697, 577 *A.*2d 503 (1990)).

> There is nothing clearer to the public, however, than stealing a client's money and nothing worse. Nor is there anything that affects public confidence more—much more than the offense itself—than this Court's treatment of such offenses. Arguments for lenient discipline overlook this effect as well as the overriding importance of maintaining that confidence.
>
> [*Wilson, supra,* 81 *N.J.* at 457, 409 *A.*2d 1153.]

Because of the harshness of *Wilson,* and because the sanction of disbarment in New Jersey is permanent, we have demanded clear and convincing evidence that an attorney has misappropriated funds "knowingly." *Roth, supra,* 140 *N.J.* at 444, 658 *A.*2d 1264; *see Barlow, supra,* 140 *N.J.* at 196, 657 *A.*2d 1197 ("Proof of misappropriation, by itself, is insufficient to trigger the harsh penalty of disbarment. Rather, the evidence must clearly and convincingly prove that respondent misappropriated client funds knowingly."). In each case where there has been an invasion of trust funds, we have carefully considered the particular complex of facts in order to determine whether "the lawyer intended it, knew it, and did it." *Konopka, supra,* 126 *N.J.* at 234, 596 *A.*2d 733 (citing *In re Librizzi,* 117 *N.J.* 481, 490–91, 569 *A.*2d 257 (1990), *In re Gallo,* 117 *N.J.* 365, 371–73, 568 *A.*2d 522 (1989), and *In re*

*Simeone*, 108 *N.J.* 515, 521–23, 531 *A*.2d 729 (1987)). Attorneys who have committed "flagrant record-keeping violations but not ... intentional misappropriation" have been severely disciplined but not disbarred. *Id.* at 238, 596 *A*.2d 733; *see, e.g., In re LaVigne*, 146 *N.J.* 590, 606–10, 684 *A*.2d 1362 (1996) (suspending attorney for three years who, *inter alia*, negligently misappropriated client funds during complex land exchange transaction); *In re Chidiac*, 120 *N.J.* 32, 38–39, 575 *A*.2d 1355 (1990) (suspending attorney for three years whose negligent bookkeeping resulted in misappropriation of client funds). Thus, the harshness of disbarment has been ameliorated by the Court's insistence on a high level of proof that the attorney understood on some level what he or she was doing and knowingly carried out a scheme to defraud.

In other cases, we have been unconvinced that attorneys suffering from identifiable compulsive disorders, mental illness, or mental conditions could demonstrate "a loss of competency, comprehension or will of a magnitude that could excuse egregious misconduct that was clearly knowing, volitional and purposeful." *Jacob, supra*, 95 *N.J.* at 137, 469 *A*.2d 498; *see, e.g., Roth, supra*, 140 *N.J.* at 448, 658 *A*.2d 1264 (major depression); *In re Davis*, 127 *N.J.* 118, 130–32, 603 *A*.2d 12 (1992) (alcoholism); *In re Spina*, 121 *N.J.* 378, 390–91, 580 *A*.2d 262 (1990) (narcissistic personality disorder); *In re Steinhoff*, 114 *N.J.* 268, 273–74, 553 *A*.2d 1349 (1989) (drug dependency); *In re Nitti*, 110 *N.J.* 321, 325–26, 541 *A*.2d 217 (1988) (compulsive gambling); *Jacob, supra*, 95 *N.J.* at 136–38, 469 *A*.2d 498 (thyrotoxicosis). In those cases we have independently reviewed the record and determined that the "medical facts" presented did not provide a sufficient basis for "a legal excuse or justification" in mitigation of the respondents' acts of misappropriation. *Id.* at 137, 469 *A*.2d 498. This result is consonant with the Court's view, clearly expressed in *Wilson*, that disbarment would "be almost invariable" in misappropriation cases.

The NJSBA seeks a less rigorous standard. The Bar has suggested that an attorney guilty of knowing misappropriation of

a client's funds should not be disbarred if the attorney can show, by clear and convincing evidence, that "an identifiable illness ... caused substantial impairment of judgment" and that substantial additional mitigating factors unconnected to the illness were present. We have, however, revisited the *Wilson* rule in the past and have concluded that strict conformity to *Wilson* is appropriate and necessary. *See, e.g., Konopka, supra,* 126 *N.J.* at 231, 236–38, 596 *A.*2d 733 (declining to accept suggestion in concurring opinion "that there should be exceptions to *Wilson* 'under special circumstances'"). We are mindful that in 1983 the NJSBA supported permanent disbarment in cases of knowing misappropriation "'without exception.'" *Id.* at 236, 596 *A.*2d 733 (quoting New Jersey State Bar Association, *Report of Select Committee to Review Standards for Safeguarding Clients' Property* 1–2, 6 (1983)). After a careful examination of the Bar's present proposal, we have concluded that it represents a substantial retreat from the standard enunciated in *Wilson.*

■ Today, we again reaffirm the rule announced in *Wilson* and hold that disbarment is the appropriate sanction in cases where it has been shown, by clear and convincing evidence, that an attorney has knowingly misappropriated client funds. We accept as an inevitable consequence of the application of this rule that rarely will an attorney evade disbarment in such cases. Public confidence in the "integrity and trustworthiness of lawyers" requires no less. *Wilson, supra,* 81 *N.J.* at 456, 409 *A.*2d 1153.

## B

*Wilson* necessarily focused on the trust extended from a client to his or her attorney and the terrible breach of that trust in a case involving the misappropriation of a client's funds. *Id.* at 454–57, 409 *A.*2d 1153. That trust, although buttressed by knowledge of the individual attorney, springs from "faith ... in the legal profession [and] the bar as an institution." *Id.* at 455, 409 *A.*2d 1153. That trust is destroyed when a lawyer takes monies that belong to a client.

Under our Constitution, the Supreme Court "ha[s] jurisdiction over the admission to the practice of law and the discipline of persons admitted." *N.J. Const.* art. VI, § 2. par. 3. In furtherance of this constitutional responsibility, the Court has promulgated the Rules of Professional Conduct as the regulatory framework for attorney discipline in appropriate cases. The RPCs serve as a road map for the conduct of attorneys to guide them in their relationships with their clients, other attorneys, the courts, and the public. The rules deal comprehensively with attorneys' obligations to their clients because that is what the practice of law is about—the representation of persons and entities in need of legal services. The *Wilson* rule reflects the application of the most exacting ethical standards to the relationship between attorneys and their clients.

The relationship of attorneys to one another is also subject to the Court's disciplinary oversight. Lawyers who join together to practice, as a partnership or professional corporation, convey a "message" to the public. *In re Weiss, Healey & Rea,* 109 *N.J.* 246, 251–52, 536 *A.*2d 266 (1988).

> Such partnership implies the full financial and professional responsibility of a law firm that has pooled its resources of intellect and capital to serve a general clientele.... The public, we believe, infers that the collective professional, ethical, and financial responsibility of a partnership-in-fact bespeaks the "kind and caliber of legal services rendered."
>
> [*Id.* at 252, 536 *A.*2d 266 (citation and footnote omitted).]

Lawyers who practice together are bound by those strictures generally applicable to individual lawyers and by rules specifically applicable to law firms.

Underlying each of the Rules that affect law firm organization and the representation of clients by lawyers practicing together is the interest in protecting clients, past, present, and prospective, and concern about the public perception of the bar. The RPCs control, among other things, the ability of lawyers to form partnerships with non-lawyers, *RPC* 5.4, law firm advertising, including firm names, *RPC* 7.1–.5, and the disqualification of law firms based upon the conflicts of individual lawyers in the firm, *RPC*

1:10. The rules are designed to protect clients by insuring that non-lawyers are not practicing law, that clients and potential clients receive accurate information about law firms, and that confidentiality is maintained. Law firms are the vehicles through which clients retain individual attorneys and the cultures in which those individual attorneys function once retained. It is the firm's reputation—the sum of the reputations of the lawyers practicing together—that attracts clients and that suggests the lawyers in the firm can be trusted with the clients' most difficult problems and with the clients' assets. Lawyers who betray their partners betray that trust.

Most important, the Court has recognized "no ethical distinction between a lawyer who for personal gain willfully defrauds a client and one who for the same untoward purpose defrauds his or her partners." *Siegel, supra,* 133 *N.J.* at 167, 627 *A.*2d 156. Our perception that such acts of theft are morally equivalent does not derive from the relationships between attorneys and their clients or attorneys and their partners but, rather, from our belief that "misappropriation from the latter is as wrong as from the former." *Id.* at 170, 627 *A.*2d 156. Moreover, it is not clear that a distinction between client funds and firm funds is readily made by the average person. The general public is unlikely to know that attorneys are required to maintain separate accounts for client and firm funds, *RPC* 1.15, and may fear that the misappropriation of firm funds is synonymous with the misappropriation of client funds. It is this threat to public confidence in the integrity and trustworthiness of the bar that motivated the Court in *Wilson.*

■ The *Wilson* rule, as described in *Siegel, supra,* applies in this case: "In the absence of compelling mitigating factors justifying a lesser sanction, which will occur quite rarely, misappropriation of firm funds will warrant disbarment." 133 *N.J.* at 167–68, 627 *A.*2d 156 (citations omitted).

## C

■ Respondent contends that the *Wilson* rule should not apply to him because his acts of misappropriation pre-dated *Siegel,*

which was decided on July 23, 1993. *Id.* at 162, 627 *A.*2d 156. The record, however, does not support his claim.

On July 23, 1993, the day *Siegel* was filed, respondent requested and obtained a check made payable to Dr. Budnick. In the days following, when the New Jersey legal periodicals were circulating and critiquing the *Siegel* opinion, *see, e.g., Supreme Court; In the Matter of Steven G. Siegel, an Attorney-at-Law,* State Digests, *N.J.L.J.,* July 26, 1993, 73–76; *Court Says Thefts From Firm Call for Disbarment, N.J.L.J.,* August 9, 1993, 5, 35, respondent took no steps to return funds previously taken. Rather, on August 17, 1993, he requested an additional $23,500 in the name of Sawyer Electric to be drawn on firm funds. When questioned by the firm's Chief Financial Officer about his request, respondent stated, "If anyone found out about this I would be disbarred." We cannot but conclude that respondent was well aware of the post-*Siegel* consequences of his final request. Even then, he did not conform his conduct to the requirements of law or of the ethics rules.

In any case, prior to this Court's decision in *Siegel,* it was clear that acts of theft often carried the sanction of disbarment. *See, e.g., Spina,* 121 *N.J.* at 390, 580 *A.*2d 262 (disbarring attorney who pled guilty to federal misdemeanor of taking property belonging to employer, including false reimbursements and checks intended for employer); *In re Lunetta,* 118 *N.J.* 443, 446–50, 572 *A.*2d 586 (1989) (disbarring attorney who, for his participation in conspiracy to receive, sell and dispose of stolen securities, realized profit of $20,000 to $25,000); *In re Surgent,* 104 *N.J.* 566, 567–69, 518 *A.*2d 215 (1986) (disbarring attorney who was guilty of, *inter alia,* conspiracy to commit theft by deception, stock fraud, and sale of unregistered securities); *In re Alosio,* 99 *N.J.* 84, 90, 491 *A.*2d 628 (1985) (disbarring attorney who engaged in conduct violating *Disciplinary Rule* 1–102(A)(3), (4), predecessor to *RPC* 8.4(b), (c), and thereby "demonstrate[d] his unfitness to remain as a member of the bar"). The *Siegel* Court rejected a similar argument "that respondent's lack of notice compels a lesser sanction," *Siegel,*

*supra,* 133 *N.J.* at 168, 627 *A.2d* 156, and we agree. The *Wilson /Siegel* rule is appropriately applied in respondent's case.

## V

Although Greenberg admits that, over a period of sixteen months, he obtained $27,025 in Horn, Goldberg funds, retained the $7500 Harrison personal injury fee, and used these funds for his own purposes without the firm's knowledge or consent, he argues that he is not guilty of knowing misappropriation. Rather, he asserts that he has satisfied the *Jacob* standard—that he was suffering from a mental illness which caused him to suffer a "loss of competency, comprehension or will"—through expert testimony proving that his motive was to hurt himself not his firm, that he was out of touch with reality, and that he had no conscious awareness of his actions. At its core, respondent's argument is framed both as an affirmative defense to the "knowing" misappropriation requirement of the rule, and as a presentation of substantial mitigating circumstances that he claims justify his conduct.

## A

In respect of his intent, respondent's expert Dr. Glass, testified:

The will for Mr. Greenberg was to punish Mr. Greenberg. The will was not to hurt the law firm of Horn [Goldberg], not to hurt clients. The will was to cry for help. So however we define that, I believe that he did not have the intent to commit criminal activity. He had the intent to call attention to his own personal plight, personal pain and personal suffering.

By his expert's testimony, respondent attempts to draw a distinction between "taking" and "stealing," that is, he does not deny his intent to "take" firm funds but, rather, denies that his motive was to "steal" firm funds, to hurt the firm or its clients.

This distinction does not assist respondent. *Wilson* suggested, and we have consistently held, that "[t]he motive of the lawyer is irrelevant in determining the appropriate discipline for knowing misappropriation." *Roth, supra,* 140 *N.J.* at 444, 658 *A.2d* 1264; *Warhaftig, supra,* 106 *N.J.* at 533, 524 *A.2d* 398;

*Wilson, supra,* 81 *N.J.* at 455 n. 1, 409 *A.*2d 1153 (holding that misappropriation does not depend on "whether or not [an attorney] derives any personal gain or benefit therefrom"). In *Noonan, supra,* we elaborated by example our firm conviction that an attorney's motive is simply not material in a misappropriation case:

> It makes no difference whether the money is used for a good purpose or a bad purpose, for the benefit of the lawyer or for the benefit of others, or whether the lawyer intended to return the money when he took it, or whether in fact he ultimately did reimburse the client; nor does it matter that the pressures on the lawyer to take the money were great or minimal. The essence of *Wilson* is that the relative moral quality of the act, measured by these many circumstances that may surround both it and the attorney's state of mind, is irrelevant: it is the mere act of taking your client's money knowing that you have no authority to do so that requires disbarment.
>
> [102 *N.J.* at 160, 506 *A.*2d 722.]

*See also Barlow, supra,* 140 *N.J.* at 195, 657 *A.*2d 1197 ("Even when the lawyer 'borrows' without permission rather than steals, we have invariably imposed disbarment rather than a lesser sanction."). Respondent's motive, whether it was to hurt himself or to hurt his law firm, is irrelevant.

■ In making the determination whether an attorney lacked competency, comprehension or will, we have considered whether he or she was "out of touch with reality or unable to appreciate the ethical quality of his [or her] acts." *In re Bock,* 128 *N.J.* 270, 273, 607 *A.*2d 1307 (1992). Respondent relies on the testimony of two experts to support his claim that he was "out of touch with reality" and had no conscious awareness of his actions when he misappropriated firm funds. Dr. Glass stated that respondent was "out of conscious touch with reality;" Dr. Chazin spoke of some form of dissociation:

> If he were truly consciously aware—and I think that part of his problem was that it was not available to his consciousness. Even though he didn't suffer from a dissociative disorder, I think that he dissociated when he did this. He was on a different plane. He was almost like a self-hypnotic kind of different person.

Neither expert goes so far as to claim that respondent was out of touch with reality or, alternatively, that he did not know what he was doing when he committed multiple acts of misappropriation.

Instead, Drs. Chazin and Glass opine that respondent's acts of misappropriation were available to his consciousness for only short periods of time—during and just after the acts took place—after which they were confined to his subconscious. Rather than supporting respondent's claim, this testimony indicates that respondent did understand what he was doing at the time he was doing it.

Moreover, we find unpersuasive the expert testimony that respondent was not conscious of what he was doing because his acts of misappropriation were kept isolated from his consciousness by his subconscious drive to self-destruct. Drs. Chazin and Glass testified that respondent's acts of theft were caused by his mental disorder. Although respondent's friends and colleagues stated that, in retrospect, he had begun to withdraw from many of his former activities, he continued to function as an attorney and to participate in various social and religious activities. Even respondent admits that during this period he was "trying cases and functioning as an attorney." No reasonable explanation has been provided for respondent's ability generally to function as a normal person in everyday life and yet suffer from a mental illness causing him to devise a complicated system of misappropriation unavailable to his consciousness. Dr. Sadoff testified, "I just don't know of any mental illness that would deprive him of his cognitive functions in this particular area and not globally, not across the board. There's just no such illness." Based on this testimony and the facts presented, the Court finds respondent's claim of selective amnesia unpersuasive.

Neither of respondent's experts testified that during the time he was stealing money from his law firm he was unable to appreciate the difference between right and wrong or the nature and quality of his acts. *See In re Baker,* 120 *N.J.* 496, 505, 577 *A.*2d 158 (1990) ("Here, as in *Romano,* respondent 'has failed to demonstrate that a disease of the mind rendered him unable to tell right from wrong or to understand the nature and quality of his acts.'" (quoting *In re Romano,* 104 *N.J.* 306, 311, 516 *A.*2d 1109 (1986))).

Indeed, respondent's own words clearly indicate he understood that his acts were wrong. Nor did respondent's experts say that respondent's will was overborne or that he otherwise satisfied the *Jacob* standard.[3]

Respondent carried out a carefully constructed scheme constituting a " 'pattern of activity,' " *Siegel, supra,* 133 *N.J.* at 167, 627 *A.2d* 156 (quoting *Spina, supra,* 121 *N.J.* at 390, 580 *A.2d* 262), over the course of more than one year. He engaged in multiple acts of misappropriation, taking $34,525 from Horn, Goldberg that he used for his own purposes without the authorization or knowledge of members of the firm. Respondent kept a fee due his firm by instructing his clients to issue him a check in the fee amount. Respondent authored numerous fraudulent check requests and transmittal letters designed to obtain firm funds without detection. Respondent forged signatures, "borrowed" a business stamp and, in the case of checks issued to SSMS, signed his own name in order to cash the checks. Respondent made calculated withdrawals and never created overdrafts. He used the monies he obtained for his own personal purposes, including mortgage payments on his residence and country club dues. This pattern of activity does not suggest an attorney suffering such a loss of competency, comprehension or will that he was unable to comply with the rules of ethics; it evidences an attorney who, through a complex plan, sought to defraud his law firm.

Respondent's mental illness, however severe, did not deprive him of the knowledge that he was taking firm funds, that the

---

[3] The Bar argues that the logic of the recent Third Circuit opinion of *United States v. McBroom,* 124 *F.*3d 533 (3d Cir.1997), compels a contrary result. We disagree. In *McBroom,* the Third Circuit held that "mental capacity," within the meaning of the federal-criminal-sentencing guidelines, has a volitional as well as a cognitive component. *Id.* at 548. This is an attorney disciplinary matter. We have long recognized "that the primary reason for discipline is not to punish the attorney but to protect the public against members of the bar who are unworthy of their trust." *In re Librizzi,* 117 *N.J.* 481, 492, 569 *A.2d* 257 (1990). Further, because respondent does not claim that an irresistible impulse or an inability to "exercise control over his own behavior," *McBroom, supra,* 124 *F.*3d at 549, caused his acts, the reasoning of *McBroom* is unhelpful to his argument.

funds belonged to his firm, or that his firm had not authorized the taking.

## B

Greenberg also argues that substantial mitigating factors should excuse his conduct. In similar cases, where attorneys have asserted a disorder, illness or condition as a mitigating factor, we have required "adequate proof that the underlying disability was so severe as to excuse or mitigate the ethical violation." *In re Trueger,* 140 *N.J.* 103, 116, 657 *A.*2d 847 (1995). In this case, we have determined that respondent's mental illness did not meet the standard set by this Court in *Jacob, supra,* and therefore failed to support his asserted affirmative defense to knowing misappropriation. For the same reasons, respondent's mental illness does not serve to mitigate his conduct. We recognize that all three experts in this case agreed respondent suffered from depression. Yet "[m]any lawyers have suffered far worse without stealing from their clients or their partners. We cannot excuse respondent without exonerating every lawyer who suffers personal hardships and misappropriates funds."[4] *Siegel, supra,* 133 *N.J.* at 171, 627 *A.*2d 156.

Respondent also asserts the following mitigating factors unconnected to his illness: voluntary notification of wrongdoing to his partners, the prosecutor's office and the OAE; lack of a criminal complaint filed by his firm; lack of criminal charges filed by the prosecutor's office; admission of wrongdoing; voluntary suspension of license since 1993; full restitution; cooperation with the

---

[4] Respondent points out that depression is a prevalent mental illness among professionals, especially attorneys. Dr. Glass testified that thirty percent of professionals suffer from depression at some time during their careers according to a National Institute of Mental Health study. Respondent's brief cites a Johns Hopkins University study indicating that attorneys are three-and-one-half times more likely than persons in other occupations to suffer from depression. The relatively small number of misappropriation cases reported to the OAE suggests that very few of the attorneys who suffer from depression manifest their mental illness by acts of theft.

OAE; extensive rehabilitation; and a previously outstanding reputation in the community.

Following his confrontation with the firm's Chief Financial Officer, respondent authorized his friend D'Amato to notify the firm, the prosecutor and the OAE about his illegal activities. Respondent claims that this notification was voluntary. The record, however, supports an inference that he only came forward because he feared discovery. *See supra* at 143–144, 714 *A*.2d at 246. As for respondent's reliance on the failure to prosecute, whatever reasons the prosecutor and the firm had for declining to press charges, we cannot ignore respondent's admissions to criminal acts of misappropriation. Moreover, we cannot accept as mitigating factors his admission of guilt and subsequent voluntary suspension of license because he acted only after he believed the firm knew what he had done. On the issue of restitution, *Wilson, supra,* held: " 'We do not attach very much importance, as a rule, to the matter of restitution, because that may depend more upon financial ability or other favoring circumstances than repentance or reformation.' " 81 *N.J.* at 457–58, 409 *A*.2d 1153 (quoting *In re Harris,* 88 *N.J.L.* 18, 22–23, 95 *A.* 761 (Sup.Ct.1915) (*en banc* )).

Respondent raises two additional mitigating factors: his rehabilitation and his reputation. In respect of respondent's rehabilitation efforts, Drs. Chazin, Glass and Sadoff agree that respondent has undergone extensive treatment and, should such treatment continue, is unlikely to commit unethical behavior in the future. To permanently disbar him now may appear unjust. Again, in *Wilson,* the Court addressed the apparent injustice flowing from the disbarment of an arguably rehabilitated attorney:

To disbar ... despite the possibility that such reformation may occur is so terribly harsh as to require the most compelling reasons to justify it. As far as we are concerned, the only reason that disbarment might be necessary is that any other result risks something even more important, the continued confidence of the public in the integrity of the bar and the judiciary.

[*Id.* at 460, 409 *A*.2d 1153 (footnotes omitted).]

*See also In re Hughes,* 90 *N.J.* 32, 36–37, 446 *A.*2d 1208 (1982) ("[E]ven if it is unlikely that the attorney will repeat the misconduct, certain acts by attorneys so impugn the integrity of the legal system that disbarment is the only appropriate means to restore public confidence in it."). Respondent's acts of theft cannot be excused by his subsequent treatment.

We disagree with the Bar's conclusion that, "[i]f Joel Greenberg is disbarred, the message to all attorneys who suffer from mental illness, alcoholism, or drug addiction is that they should not come forward, should continue to practice, should continue to represent clients, and should not seek help." We do not sanction Greenberg because he suffers from a mental illness. Greenberg betrayed a sacred trust—he stole money from his partners. The message which this case sends to the bar is not that attorneys in need of assistance should continue to practice without seeking help but, rather, that such attorneys should seek help as soon as possible and certainly if they are about to engage in activities that will irreparably damage their professional reputation and the public's confidence in the integrity of the Bar.

Greenberg's exemplary reputation among his peers and within his community has not gone unnoticed by this Court. We are in receipt of over 120 letters testifying to his honesty and integrity. He was a partner in a successful law firm and has, by all accounts, served his clients well. But he is unfortunately not the only attorney with an outstanding reputation who has committed acts of theft and has been disbarred. *See, e.g., Siegel, supra,* 133 *N.J.* at 167, 627 *A.*2d 156; *In re Kelly,* 120 *N.J.* 679, 689, 577 *A.*2d 497 (1990). This is because "the primary reason for discipline is not to punish the attorney [but,] rather, . . . to preserve the confidence of the public in the integrity and trustworthiness of lawyers in general.'" *Gallo, supra,* 117 *N.J.* at 373–74, 568 *A.*2d 522 (quoting *Wilson, supra,* 81 *N.J.* at 456, 409 *A.*2d 1153). Here, as in *Siegel, supra,* "[t]he egregiousness of respondent's dishonesty should have been readily apparent to so distinguished a practi-

tioner." 133 *N.J.* at 171, 627 *A.*2d 156. We cannot excuse his conduct.

Respondent is disbarred. He is ordered to reimburse the Disciplinary Oversight Committee for appropriate administrative costs.

STEIN, J., dissenting.

In *In re Wilson,* 81 *N.J.* 451, 409 *A.*2d 1153 (1979), this Court abandoned its longstanding prior practice of weighing mitigating circumstances in imposing discipline on lawyers who misappropriate client funds, and adopted a rule of virtually automatic disbarment for that most egregious infraction:

> In this case, respondent knowingly used his clients' money as if it were his own. We hold that disbarment is the only appropriate discipline. We also use this occasion to state that generally all such cases shall result in disbarment. We foresee no significant exceptions to this rule and expect the result to be almost invariable.
>
> [*Id.* at 453, 409 *A.*2d 1153.]

Applying the *Wilson* rule, the Court today orders the disbarment of respondent Joel Greenberg. Prior to the events that triggered this proceeding, Greenberg was a partner in a large Atlantic City law firm. He was an experienced and highly successful litigator, specializing in the defense of medical malpractice cases. He enjoyed an impeccable reputation for integrity and professionalism, and was widely respected by lawyers in Atlantic County.

From August 1992 to July 1993, Greenberg misappropriated approximately $27,000 from his law firm by submitting false disbursement requests to the bookkeeping department and endorsing for his own use the checks generated by those requests. No client funds were taken. The three psychiatric experts who testified at the hearing before the Special Ethics Master—Dr. Norman Chazin, respondent's treating psychiatrist, Dr. Gary Glass, respondent's expert, and Dr. Robert Sadoff, the expert retained by the Office of Attorney Ethics (OAE)—agreed that Greenberg's misconduct was related directly to a "major depres-

sive disorder," that his conduct was aberrational and self-destructive, and that as a result of successful psychiatric treatment the aberrational conduct in which Greenberg engaged was highly unlikely to reoccur. Greenberg made full restitution to his firm. Before anyone at the law firm confronted him about his misconduct, Greenberg disclosed to friends what he had done, surrendered his license to practice law, and acknowledged his misconduct to his partners as well as to the Atlantic County Prosecutor. He has been voluntarily suspended from law practice since September 1993. He had no prior history of discipline.

I disagree with the Court's disposition on three grounds. First, the rigid *Wilson* rule of automatic disbarment was intended to be and should be applied only to misappropriation of clients' funds. The discipline for other misconduct not involving client funds or implicating dishonesty that directly subverts the administration of justice, see *In re Verdiramo*, 96 *N.J.* 183, 186, 475 *A.*2d 45 (1984), should be individualized, consistent with Justice Pashman's observation in *In re Sears*, 71 *N.J.* 175, 201–02, 364 *A.*2d 777 (1976):

> Such judgments, by their very nature, rest on assessments of individual character. Therefore, we will not subscribe to a policy controlling future cases without knowledge of the facts which may arise in those cases. We previously stated that "each case must rest largely upon its own particular circumstances."
> [Quoting *In re Greenberg*, 21 *N.J.* 213, 225, 121 *A.*2d 520 (1956).]

Second, even if the Court insists on expanding the *Wilson* rule beyond its intended scope to include misappropriations from a law firm, that broadened application of *Wilson* should not determine respondent's discipline. This Court for the first time suggested in *In re Siegel*, 133 *N.J.* 162, 168, 627 *A.*2d 156 (1993), that the *Wilson* rule of virtually automatic disbarment would apply to misappropriation of law firm funds. *Siegel* was decided July 23, 1993, the day on which respondent had received the last of the firm's checks pursuant to his improper requests for disbursements. In *In re Smock*, 86 *N.J.* 426, 432 *A.*2d 34 (1981), a post-*Wilson* case involving misappropriation of client funds, this Court imposed a two-year suspension on the respondent and held that it would be "manifestly unfair to apply *Wilson* retroactively." *Id.* at

427, 432 *A*.2d 34. The Court observed that deterrence, a primary objective of the *Wilson* rule, would not be advanced by applying *Wilson* retroactively. *Id.* at 427–28, 432 *A*.2d 34. Respondent should be treated no worse than Smock, and *Siegel* should not be applied retroactively in this disciplinary proceeding.

Finally, my view of this record is that respondent's conduct was so obviously the product of a major depressive disorder the susceptibility to which respondent shared with several other family members, and so diametrically antagonistic to respondent's exemplary ethical standards exhibited during eighteen years of law practice, that disbarment after almost five years of suspension is an unnecessarily harsh discipline. Based on the outpouring of letters from respondent's colleagues, that view is shared by the leadership of the Atlantic County Bar who know respondent's character and attributes far better than do the members of this Court.

I

The Court should exercise caution and restraint in considering the extent to which it should apply rigid, bright-line rules in attorney disciplinary proceedings. Disbarment is the most unforgiving discipline, and it condemns every lawyer on whom it is imposed to a life sentence of professional disgrace. In New Jersey, unlike most other states, disbarment is permanent and its stigma is ineradicable. As Justice Schreiber observed in *In re Hughes*, "we must not forget that disbarment is a punishment and its effect can be devastating. In deciding whether to disbar, the Court should consider the whole person." 90 *N.J.* 32, 42, 446 *A*.2d 1208 (1982)(Schreiber, J., dissenting) (citation omitted).

In adopting the *Wilson* rule, this Court was influenced profoundly by the unique quality of the lawyer-client relationship that prompts clients to entrust their funds to lawyers:

> Like many rules governing the behavior of lawyers, this one has its roots in the confidence and trust which clients place in their attorneys. Having sought his advice and relying on his expertise, the client entrusts the lawyer with the

transaction—including the handling of the client's funds. Whether it be a real estate closing, the establishment of a trust, the purchase of a business, the investment of funds, the receipt of proceeds of litigation, or any one of a multitude of other situations, it is commonplace that the work of lawyers involves possession of their clients' funds. That possession is sometimes expedient, occasionally simply customary, but usually essential. Whatever the need may be for the lawyer's handling of clients' money, the client permits it because he trusts the lawyer.

It is a trust built on centuries of honesty and faithfulness. Sometimes it is reinforced by personal knowledge of a particular lawyer's integrity or a firm's reputation. The underlying faith, however, is in the legal profession, the bar as an institution. No other explanation can account for clients' customary willingness to entrust their funds to relative strangers simply because they are lawyers.

[81 *N.J.* at 454–55, 409 *A.*2d 1153.]

The Court emphasized that although other attorney conduct may be equally reprehensible, public confidence in the bar as an institution demands the severest discipline for misappropriation of client funds:

What are the merits in these cases? The attorney has stolen his clients' money. No clearer wrong suffered by a client at the hands of one he had every reason to trust can be imagined. The public is entitled, not as a matter of satisfying unjustifiable expectations, but as a simple matter of maintaining confidence, to know that never again will that person be a lawyer. That the moral quality of other forms of misbehavior by lawyers may be no less reprehensible than misappropriation is beside the point. Those often occur in a complex factual setting where the applicability or meaning of ethical standards is uncertain to the bench and bar, and especially to the public, which may not even recognize the wrong. There is nothing clearer to the public, however, than stealing a client's money and nothing worse. Nor is there anything that affects public confidence more—much more than the offense itself—than this Court's treatment of such offenses.

[*Id.* at 456–57, 409 *A.*2d 1153.]

With respect to mitigating circumstances, the *Wilson* opinion acknowledged that a rule that excludes any consideration of circumstances leading to the misappropriation or the exemplary record of the offending lawyer was "terribly harsh," justifiable only by the overriding need to retain public confidence in the bar:

The considerations that must deeply trouble any court which decrees disbarment are the pressures on the attorney that forced him to steal, and the very real possibility of reformation, which would result in the creation of a new person of true integrity, an outstanding member of the bar. There can be no satisfactory answer to this problem. An attorney, beset by financial problems, may steal to save his family, his children, his wife or his home. After the fact, he may conduct so exemplary a life as to prove beyond doubt that he is as well equipped to serve

the public as any judge sitting in any court. To disbar despite the circumstances that led to the misappropriation, and despite the possibility that such reformation may occur is so terribly harsh as to require the most compelling reasons to justify it. As far as we are concerned, the only reason that disbarment might be necessary is that any other result risks something even more important, the continued confidence of the public in the integrity of the bar and the judiciary.

[*Id.* at 460, 409 *A.*2d 1153 (citation and footnotes omitted).]

Because of the "terrible harshness" of a rule of automatic disbarment that precludes consideration of mitigating circumstances, prior to *Siegel* we had applied the principle of automatic disbarment only to knowing misappropriation of client funds, *Wilson, supra,* 81 *N.J.* 451, 409 *A.*2d 1153, and in cases of criminal dishonesty that "directly impact[s] the administration of justice" and thereby "directly poison[s] the well of justice." *In re Verdiramo, supra,* 96 *N.J.* at 186, 475 *A.*2d 45. We have applied the *Verdiramo* rule in appropriate cases. *See, e.g., In re Edson,* 108 *N.J.* 464, 465–70, 530 *A.*2d 1246 (1987)(ordering disbarment of attorney who counseled client to fabricate defense in DWI case); *In re Conway,* 107 *N.J.* 168, 179–80, 526 *A.*2d 658 (1987)(ordering disbarment of attorney who participated in conspiracy to bribe witness in order to secure dismissal of criminal prosecution); *cf. In re Tuso,* 104 *N.J.* 59, 64, 514 *A.*2d 1311 (1986)(ordering disbarment of attorney who attempted to bribe school board member in order to influence award of contract for architectural services).

However, in cases involving crimes of dishonesty not directly affecting the administration of justice, we consistently have engaged in a case-by-case analysis to determine the appropriate discipline, carefully evaluating the aggravating and mitigating factors that inform the discretionary exercise of our disciplinary authority. In *In re Imbriani,* 149 *N.J.* 521, 694 *A.*2d 1030 (1997), in which we ordered disbarment of a former Superior Court Judge who pled guilty to the third-degree theft offense of failure to make required disposition of property, we explained the process that guides our determinations concerning the imposition of discipline:

Similar to a sentencing judge in a criminal matter, we take into consideration many factors in determining the proper discipline to be imposed. *Cf. N.J.S.A.* 2C:44–1. We consider the nature and severity of the crime, and whether the crime is related

to the practice of law. We consider "evidence which does not dispute the crime but which shows mitigating circumstances [relevant to] the issue of whether the nature of the 'conviction merits discipline and, if so, the extent thereof.'" *In re Mischlich,* 60 *N.J.* [590,] 593, 292 *A.*2d 23 (citations omitted); see *In re Rosen,* 88 N.J. [1,] 3, 438 A.2d 316; *In re Mirabelli,* 79 *N.J.* [597,] 601, 401 *A.*2d 1090; *In re La Duca,* 62 *N.J.* [133,] at 136, 299 *A.*2d 405. Similarly, we consider evidence of an attorney's good reputation, his prior trustworthy professional conduct, and his general good character. *In re Mischlich,* [*supra,*] 60 *N.J.* at 593, 292 *A.*2d 23.

[*Id.* at 531, 694 *A.*2d 1030 (quoting *In re Infinito,* 94 *N.J.* 50, 57, 462 *A.*2d 160 (1983)).]

Accordingly, in lawyer-discipline cases not involving knowing misappropriation of client's funds or criminal acts that poison the well of justice, we invariably have based our disciplinary decisions on a comprehensive evaluation of all relevant circumstances, both aggravating and mitigating. That balanced approach often, but not uniformly, has impelled us to order disbarment of attorneys who have engaged in dishonest conduct involving fraud or theft. *See, e.g., In re Goldberg,* 142 *N.J.* 557, 560–61, 666 *A.*2d 529 (1995)(ordering disbarment of attorney who pled guilty to reckless authorization of improper disbursements and mail fraud in connection with governmentally-financed housing project); *In re Messinger,* 133 *N.J.* 173, 175, 627 *A.*2d 162 (1993)(ordering disbarment of attorney convicted of conspiracy to defraud government by engaging in fraudulent securities transactions to generate tax losses); *In re Spina,* 121 *N.J.* 378, 382–90, 580 *A.*2d 262 (1990)(ordering disbarment of attorney who pled guilty to petty larceny where record established pattern of forged checks, stolen cash, false reimbursement claims and attempted concealment of theft of almost $50,000 from employer); *In re Lunetta,* 118 *N.J.* 443, 446–47, 572 *A.*2d 586 (1989)(ordering disbarment of attorney for participating in conspiracy to profit from sale of stolen securities); *In re Surgent,* 104 *N.J.* 566, 567, 518 *A.*2d 215 (1986)(ordering disbarment of attorney convicted of conspiracy to commit theft by deception, stock fraud, sale of unregistered securities and subornation of perjury); *In re Alosio,* 99 *N.J.* 84, 86–88, 491 *A.*2d 628 (1985)(ordering disbarment of attorney who masterminded scheme involving stolen high-priced cars).

Nevertheless, in many cases involving dishonest conduct implicating theft or fraudulent acts we have imposed discipline short of disbarment based on our assessment of the relevant circumstances and giving appropriate weight to mitigating factors. *See, e.g., In re Hoerst*, 135 *N.J.* 98, 100–05, 638 *A.*2d 801 (1994)(imposing six-month suspension on former county prosecutor who pled guilty to third-degree theft based on use of $7,500 in County forfeiture fund to pay for convention trip and three-day side trip for himself, female companion, colleague and colleague's spouse; describing respondent's unblemished reputation among peers and noting approximately seventy letters attesting to esteem and respect in which respondent was held by colleagues and law enforcement officials); *In re Bateman*, 132 *N.J.* 297, 298, 625 *A.*2d 467 (1993)(imposing two-year suspension on attorney convicted under federal law of mail fraud, conspiracy and making false statement on loan application to obtain inflated appraisal value of property); *In re Konigsberg*, 132 *N.J.* 263, 264, 624 *A.*2d 1366 (1993) (imposing three-year retroactive suspension on attorney convicted of falsifying statement to agency of federal government in order to obtain insurance proceeds for client); *In re Giordano*, 123 *N.J.* 362, 363–68, 587 *A.*2d 1245 (1991)(ordering three-year suspension of attorney who pled guilty to charge of tampering with public records based on respondent's admission that he conspired to obtain fictitious driver's license for client, noting that respondent's conduct was "entirely out of character for him" and was motivated by desire to gain favor with younger woman); *In re Weston*, 118 *N.J.* 477, 478, 572 *A.*2d 604 (1990)(imposing two-year suspension on attorney who engaged in "fraudulent misconduct" by signing deed and affidavit of title in client's name without authority and representing to purchaser's attorney that documents were genuine); *In re Farr*, 115 *N.J.* 231, 233–38, 557 *A.*2d 1373 (1989)(imposing six-month suspension, in addition to respondent's voluntary two-year suspension, based on DRB findings that while serving as assistant county prosecutor respondent misappropriated marijuana and PCP from evidence room of prosecutor's office for use by himself and others, continued social relationship with two police

informants arrested for CDS possession, providing them with information helpful to defense of charges against them and actively participating in handling of criminal prosecution against them; noting that respondent's conduct was aberrational, unlikely to reoccur, and that respondent had been effectively rehabilitated by psychiatric counseling); *In re Silverman*, 113 *N.J.* 193, 196, 227, 549 *A.*2d 1225 (1988)(imposing six-year suspension on attorney who improperly participated in business venture with uncounseled client, and made numerous misrepresentations and false statements under oath in course of transaction, noting respondent's previously unblemished record, acknowledgment of seriousness of transgressions and cooperation in disciplinary proceeding); *In re Stier*, 108 *N.J.* 455, 456, 461, 530 *A.*2d 786 (1987)(imposing one-year suspension on attorney who pled guilty to disorderly persons offense of tampering with public records on basis of admission that respondent prepared and recorded two deeds reflecting inflated purchase prices in order to assist purchaser in reselling properties at substantial profit; noting by way of mitigation respondent's unblemished record as attorney and exemplary service to community); *In re Di Biasi*, 102 *N.J.* 152, 153, 506 *A.*2d 719 (1986)(ordering three-month suspension of attorney who pled guilty to federal offense of misapplication of bank funds based on admission that respondent falsely represented to mortgage lender that binding lease was in effect for vacant portion of commercial building that secured mortgage loan); *In re Labendz*, 95 *N.J.* 273, 274–79, 471 *A.*2d 21 (1984)(ordering one-year suspension of attorney based on DRB finding that attorney falsely inflated purchase price of residential property to enable buyers to qualify for amount of mortgage required to complete transaction, and attempted to arrange sham closing to mislead bank into completing mortgage loan; noting relevance of respondent's unblemished record and excellent reputation in determining appropriate discipline); *In re Infinito*, 94 *N.J.* 50, 52–58, 462 *A.*2d 160 (1983)(imposing three-year suspension on attorney convicted of larceny and conspiracy to commit larceny based on evidence demonstrating that respondent and his wife misappropriated over $9,000 from funds belonging to

two adult sisters placed in respondent's home by State Division of Mental Retardation to serve as domestic workers; noting relevance in determining appropriate discipline that respondent had "an unblemished professional career and was highly regarded in the legal and general community"); *In re Franklin,* 71 *N.J.* 425, 426–29, 365 *A.*2d 1361 (1976)(imposing one-year suspension on respondent based on evidence that while serving as corporate president of publicly held company, respondent submitted fraudulent reimbursement vouchers for client entertainment in excess of $11,000; noting relevance in determining appropriate discipline of respondent's prior unblemished record, past substantial civic activities and that derelictions did not involve the practice of law).

Even with respect to attorneys charged with criminal offenses implicating egregious misconduct, this Court has seen fit to consider mitigating circumstances in determining appropriate discipline. In *In re Litwin,* 104 *N.J.* 362, 517 *A.*2d 378 (1986), respondent pled guilty to the second-degree offense of aggravated arson based on his admission that he set fire to a car wash in Plainfield owned by him. In the criminal proceeding respondent was sentenced to five years of probation subject to the condition that he undergo long-term psychiatric care. In the ensuing disciplinary proceeding, the DRB determined that respondent's criminal act resulted from a severe depression accompanied by suicidal tendencies and personality disorder. *Id.* at 366–67, 517 *A.*2d 378. In accepting the DRB's recommendation of a five-year suspension, this Court referred to respondent's previously "unblemished professional reputation," *id.* at 366, 517 *A.*2d 378, his "mental condition at the time of the offense," *id.* at 367, 517 *A.*2d 378, the aberrational nature of respondent's crime, *id.* at 368, 517 *A.*2d 378, and determined that disbarment was not required because respondent's misconduct "does not lead to the conclusion that his 'good character and fitness have been permanently or irretrievably lost,'...." *Id.* at 369, 517 *A.*2d 378 (quoting *In re Templeton,* 99 *N.J.* 365, 376–77, 492 *A.*2d 1001 (1985)).

In *In re Sears, supra,* 71 *N.J.* 175, 364 *A.*2d 777 (1976), respondent, a former Speaker of the General Assembly, Senate Majority Leader, and Chairman of the State Tax Policy Commission was found by the Morris County Ethics Committee to have delivered an illegal campaign contribution in an effort to influence the Securities and Exchange Commission's (SEC) investigation of a company controlled by Robert Vesco, of creating the impression that he could improperly influence a federal judge, of giving false testimony before a federal grand jury and in depositions concerning the SEC's investigation, and of attempting to induce the Attorney General of the United States to secure the withdrawal of subpoenas to Vesco's company. Although the federal indictment against Sears was dismissed after he was given transactional immunity in return for his testimony, the ethics charges against him stemmed from his participation in the delivery of a $200,000 cash campaign contribution to President Nixon's reelection campaign and his meetings on the same day with Attorney General John Mitchell and SEC Chairman William Casey to discuss the pending investigation of Vesco's company. This court sustained the essential findings of the Ethics Committee. In imposing a three-year suspension rather than disbarment, this Court attached substantial significance to respondent's distinguished public record, the severe state of mental depression that affected respondent's behavior, and the fact that respondent's misconduct was unlikely to reoccur:

> In the instant matter, we take note of certain extenuating circumstances. As noted above, respondent has enjoyed a long and distinguished career as an attorney and a public servant. Respondent held, at various times, a series of legislative positions for which he received the recognition and acclaim of both his colleagues and the public at large. His active role in public affairs projected respondent as a potential candidate for governor. He also enjoyed a reputation for integrity and veracity as a highly respected attorney in Morris County. The character of his reputation and its enduring nature were evidenced at the ethics hearing in this matter by the testimony of numerous retired judges and members of the Bar. The tenor of such testimony clearly reflects their high esteem for Harry L. Sears, and the witnesses' continued faith in him, despite the transgressions we now consider.
>
> . . . .

> The respondent's resulting state of mental depression is well-documented in the record. Ample testimony exists concerning the manner in which respondent has been changed from a gregarious, vibrant individual to an unresponsive and melancholy one. Furthermore, evidence at the ethics committee hearing indicated that this psychological state severely compromised respondent's ability to function normally. This condition might not only explain some of the lapses of memory which characterized respondent's testimony, but also his apparent inability to prepare for his appearances before various investigatory tribunals.
>
> In considering the appropriate disciplinary measure, we must also evaluate respondent's character and the likelihood that he will engage in similar activities in the future.... Our attention is drawn to the exemplary professional record which respondent has compiled throughout the years. This record has won him the respect and admiration of his community and his peers. In conjunction with this, respondent has apparently retained the trust of his colleagues and clients despite his unfortunate association with the events discussed herein. We find that this respect is a genuine testimony to the character of Harry L. Sears. Furthermore, we are confident that such an episode will never reoccur.
>
> [<i>Id.</i> at 199–200, 364 A.2d 777 (citations omitted).]

This extended and comprehensive survey of our disciplinary cases involving dishonest conduct implicating fraud or theft emphasizes that prior to *In re Siegel, supra*, 133 *N.J.* 162, 627 *A.*2d 156, there was no hard and fast rule mandating disbarment in cases involving theft. Moreover, this broad spectrum of disciplinary cases demonstrates that our prior policy of weighing mitigating factors in imposing discipline in all cases involving conduct other than knowing misappropriation of client funds or dishonesty directly affecting the administration of justice is sufficiently flexible to deal appropriately with charges involving fraud, theft, or other offenses without the necessity of an expanded application of the *Wilson* rule.

In my view, our observation in *Siegel* that "[w]e see no ethical distinction between a lawyer who for personal gain willfully defrauds a client and one who for the same untoward purpose defrauds his or her partners," *id.* at 167, 627 *A.*2d 156, was unnecessary to our disposition in *Siegel.* The respondent in *Siegel* had engaged in more than thirty-four separate acts of deceit over a three-year span in the course of misappropriating over $25,000 as reimbursement for false disbursements. His defalcations were not discovered until he had withdrawn from the firm and, as

distinguished from the matter before us, there was no reconciliation between Siegel and his former partners although a financial settlement was negotiated. *Id.* at 165–66, 627 *A*.2d 156. The grievance that initiated the ethics proceeding against Siegel was filed by his former law firm. *Id.* at 163, 627 *A*.2d 156. The Court characterized as unpersuasive the mitigating factors advanced by Siegel to support a lesser discipline than disbarment. *Id.* at 170, 627 *A*.2d 156. In short, the *Siegel* record demonstrated the commission of numerous acts of fraud and deception over a prolonged period that were discovered only by happenstance after the respondent had left the law firm, and no persuasive mitigating evidence diminished the venality of the respondent's conduct. In that context, no reliance on the inflexible *Wilson* rule was necessary to conclude that disbarment was the appropriate discipline.

The Court overlooks the unique and specific justifications for our holding in *Wilson* when it extends its application to misappropriation of law firm funds. Although both this matter and *Siegel* involved misappropriations by partners in large law firms, the issue can arise in a much less sophisticated context. In *In re Bromberg*, 152 *N.J.* 382, 705 *A*.2d 741 (1998), we had occasion to affirm the DRB's imposition of a reprimand on an attorney who, as a non-equity partner in a three-lawyer firm, intercepted approximately $6,600 in client checks payable to the law firm and deposited the funds in his own account, asserting a claim of right to an amount of compensation greater than that represented by the client checks. *In re Bromberg*, Docket No. DRB 97–129 (December 16, 1997). Although the DRB determined that the respondent improperly had resorted to "self-help" when he appropriated the firm checks to his own use, the DRB noted the significance of substantial mitigating factors including the managing partner's withholding of six weeks' salary from the respondent and her attempt to renegotiate their prior arrangement on terms less favorable to the respondent. The DRB determined that the respondent, under the circumstances, had not knowingly misappropriated law firm funds.

As the *Bromberg* matter reflects, charges of misappropriation from a law firm need not arise in a context as clearly characterized by fraud and deception as was the case in *Siegel*. Moreover, unlike cases involving knowing misappropriation of client funds, the public interest is not as significantly implicated in law firm cases, and the circumstances leading to the misuse of law firm funds may have a significant bearing on the degree of venality involved and on the appropriateness of disbarment or some lesser discipline. The harshness and inflexibility of the *Wilson* rule, adopted exclusively to deal with knowing misappropriation of client funds, is ill-designed to govern the imposition of discipline in the wide variety of cases that may involve charges of knowing misuse of law firm funds. The Court's weighty institutional responsibility to adjudicate fairly attorney disciplinary matters is disserved by the unnecessary and imprudent extension of the *Wilson* rule to every case involving alleged misuse of law firm funds.

## II

Even if the Court persists in its conclusion that an expanded application of the *Wilson* rule must control the imposition of discipline in every case involving misappropriation of law firm funds, the Court's determination to apply its decision in *Siegel*, *supra*, 133 *N.J.* 162, 627 *A.*2d 156, to respondent is unfair, unjustified, and inconsistent with our longstanding practice of affording only prospective effect to disciplinary decisions. Respondent's last act of misappropriation occurred on July 23, 1993, the date on which he requested and obtained a check in the amount of $1,875 payable to Dr. Glenn Budnick and, coincidentally, the date on which this Court filed its opinion in *Siegel*. As noted, *Siegel* was the first case in which the Court implied that the *Wilson* rule should govern the imposition of discipline in cases involving misappropriation of law firm funds. Our consistent practice and tradition has been to apply disciplinary decisions prospectively, in order to be absolutely certain that attorneys who

commit disciplinary offenses clearly would be forewarned of the consequences. In *In re Smock, supra,* 86 *N.J.* 426, 432 *A.*2d 34, the respondent knowingly misappropriated $4,500 of client funds and advanced numerous mitigating factors to justify discipline short of disbarment. After observing that the *Wilson* rule effectively rejected the significance of mitigating factors in such cases, the Court declined to apply *Wilson* to Smock, and observed:

> Respondent's conduct, however, predated *Wilson.* In view of the radical change effected by *Wilson,* with its strict result of disbarment in misappropriation cases as compared to this Court's treatment of such matters prior thereto, we believe it would be manifestly unfair to apply *Wilson* retroactively. A significant, although not paramount, element of the *Wilson* doctrine was its deterrent effect on the bar. Obviously, retroactive application does not in any way serve that deterrent purpose. We note, however, for the guidance of the bar and the public, that if respondent's conduct had occurred after our decision in *Wilson* he presumably would be disbarred.
>
> [86 *N.J.* at 427–28, 432 *A.*2d 34.]

Relying on the mitigating evidence advanced by the respondent, the Court imposed a retroactive two-year suspension. *Id.* at 428, 432 *A.*2d 34.

Similarly, in *In re Cornish,* 98 *N.J.* 500, 488 *A.*2d 551 (1985), the respondent had used trust funds of clients to repay retainers to other clients in the course of dissolving his law practice. All of the misappropriations occurred prior to our decision in *Wilson.* Observing that the *Wilson* mandate was not retroactive, *id.* at 511, 488 *A.*2d 551, the DRB took note of the significant evidence of mitigating factors, including the District Ethics Committee's finding that the respondent's depression had impaired his reasoning, and imposed a five-year retroactive suspension. *Id.* at 512, 488 *A.*2d 551. This Court adopted the DRB's report. *Id.* at 501, 488 *A.*2d 551.

In *In re Hollendonner,* 102 *N.J.* 21, 28–29, 504 *A.*2d 1174 (1985), this Court held for the first time that the *Wilson* rule would apply to the misappropriation of client escrow funds, but imposed only a one-year suspension on the respondent and declined to apply its holding retroactively:

The parallel between escrow funds and client trust funds is obvious. So akin is the one to the other that henceforth an attorney found to have knowingly misused escrow funds will confront the disbarment rule of *In re Wilson, supra,* 81 *N.J.* 451, 409 *A.*2d 1153. We do not apply that rule in these proceedings in view of the absence of clear and convincing evidence that Respondent invaded the escrow funds with knowledge that the use of those funds was improper. Moreover, this is the first occasion on which we have addressed the near identity of escrow funds and trust funds.

Thus, our precedents uniformly preclude the retroactive application of *Siegel* to this respondent. The Court offers as justification for its application of *Siegel* the assertion that respondent "took no steps to return funds previously taken." *Ante* at 154, 714 *A.*2d at 251. Although that criticism applied equally to the respondent in *Smock, supra,* in that case this Court elected not to rely on it.

The Court also justifies the retroactive application of *Siegel* to respondent on the basis of respondent's improper submission of a check request on August 18, 1993, payable to Southern Shore Medical Supply to be withdrawn from the retainer account of Sawyer Electric, a firm client. *Ante* at 154, 714 *A.*2d at 251. When the firm's administrator questioned respondent about the request, respondent became disconcerted and the conversation ended inconclusively. The check was never issued. Neither the Special Master's Report nor the DRB's decision relied on the check request of August 18, 1993, to support their respective conclusions that respondent knowingly had misappropriated law firm funds. The Court clearly is overreaching when it purports to justify *Siegel*'s retroactive application to respondent on the basis of an aborted attempt to obtain firm funds that played no part in the Special Master's or DRB's findings of knowing misappropriation.

Finally, the Court is literally correct when it summarizes the pre-*Siegel* case law as indicating clearly that "acts of theft often carried the sanction of disbarment," *ante* at 153, 714 *A.*2d at 251, but that observation hardly supports the Court's conclusion that application of the *Siegel* holding to respondent is fair. As this

opinion's detailed analysis of our disciplinary decisions demonstrates, our opinions have been inconclusive on the discipline for theft and have varied in the discipline imposed on the basis of the specific aggravating and mitigating factors of each case. *Supra* at 167–170, 714 *A*.2d at 258–260. It was *Siegel* that first held that theft of law firm funds would invariably invoke the *Wilson* rule of automatic disbarment, and prior to *Siegel* the bar did not have notice of that rule of law.

The Court should not rely on technicalities or overstate the effect of our precedents to justify the retroactive application of *Siegel* to respondent. The focus of our ruling on that issue should be fundamental fairness, with an emphasis on whether respondent or any other lawyer had adequate notice that the *Siegel* holding would determine the discipline to be imposed for misappropriation of law firm funds. The Court should follow its holding in *Smock* and determine respondent's discipline under the standard prevailing prior to our decision in *Siegel.*

## III

If the Court were to determine this respondent's discipline on the basis of the pre-*Siegel* standard pursuant to which all aggravating and mitigating circumstances were taken into account, the undisputed evidence in this record would argue persuasively against disbarment despite respondent's admitted misappropriation of funds from his law firm on eight separate occasions. Misappropriation indisputably is one of the most deceitful and dishonorable acts of misconduct a lawyer can commit. But what this record demonstrates clearly, convincingly and overwhelmingly is that respondent's misconduct was completely incongruous and irreconcilable with respondent's exceptional record of honesty, integrity and professionalism during his eighteen-year career as a lawyer that preceded the events at issue. Moreover, the record demonstrates that the unanimous view of the psychiatric experts—respondent's treating physician Dr. Chazin, respondent's expert Dr. Glass, and the OAE's expert Dr. Sadoff—was that respondent's misconduct was aberrational and self-destructive and

was the direct result of a major depressive disorder to which respondent was genetically susceptible.

The experts' only significant disagreement concerned whether respondent possessed the cognitive capacity, despite his depression, to commit a knowing misappropriation, Dr. Sadoff being the sole expert to express the opinion that respondent's acts were not the product of a loss of will. That testimony by the OAE's expert related directly to the standard adopted by this Court in *In re Jacob*, 95 *N.J.* 132, 137, 469 *A.*2d 498 (1984), to describe a mental condition that was inconsistent with a knowing misappropriation:

> The report does not furnish any basis grounded in firmly established medical facts for a legal excuse or justification for respondent's misappropriations. There has been no demonstration by competent medical proofs that respondent suffered a loss of competency, comprehension or will of a magnitude that could excuse egregious misconduct that was clearly knowing, volitional and purposeful.

In this case, both the Special Master and the DRB accepted Dr. Sadoff's testimony that respondent, although deeply depressed, was not delusional or out of touch with reality. Accordingly, applying the *Wilson* standard their recommendation of disbarment was inevitable. Neither the Special Master nor the DRB considered whether, if *Wilson* and *Siegel* were not controlling, the mitigating evidence in the record would justify discipline other than disbarment.

## A

Respondent was admitted to the practice of law in 1975. In February 1977 he became associated with the law firm now known as Horn, Goldberg, Gorny, Daniels, Plackter & Weiss, one of the largest and most prominent firms in Atlantic City. He became a partner of the firm in 1982. At about that time Greenberg began representing, almost exclusively, health care providers in medical malpractice actions. He was responsible for bringing to the firm as a client one of New Jersey's major medical malpractice insurance carriers, the Medical Inter–Insurance Exchange (MIIX). He became a certified civil trial attorney and tried over 125 cases to conclusion before juries throughout the state, at one point compil-

ing a string of seventy-five consecutive successful medical malpractice trials.

Respondent was an arbitrator for the American Arbitration Association and frequently served as a court-appointed arbitrator in Atlantic and other south-Jersey counties. He served as a Trustee of the Atlantic County Bar Association and participated actively in professional and bar-sponsored programs.

Respondent enjoyed an exceptionally strong reputation for honesty and integrity among his colleagues. As Joseph Sayegh, a partner in the firm of Goldenberg, Mackler and Sayegh and former President of the Atlantic County Bar Association testified:

He had a top reputation for honesty, for integrity. . . . He was the guy who people went to when they needed good considered thought, honest judgment. He was the person that everybody trusted up and down the line.

[H]is reputation was that he was a straight-shooter. He was honest. If he told you something, you could take it to the bank. I mean, you know, he was—if you wanted to rank people in the bar association and say, you know, who's who in terms of honesty and integrity and you were going to rank all, what seven or eight hundred of us now, I mean he's the guy that would be right up there, and it wouldn't be four or five people who were held in better regard by—I'm not just saying me—by the lawyers, by the judiciary, by the courthouse staff.

The Special Master's Report quoted from the testimony of A. Michael Barker, one of respondent's partners who testified about his reputation for honesty and integrity both professionally and in his community:

. Joel enjoyed an excellent reputation for his forthrightness. It was no problem at all for anyone to deal with Joel because he was always very direct and he got right down to things really quickly and he developed an excellent reputation in negotiating resolutions of cases very quickly and a great number of them and it became his strength because his reputation would precede him. Everybody knew they could trust him and they did and cases would go like that.

Personally, we went to the same synagogue. . . . I was the attorney for that synagogue and I knew his reputation with the synagogue. . . . It was excellent. You know, it was the same Joel Greenberg. Everybody always knew him. He grew up in that town and he enjoyed an excellent reputation. Everybody loves Joel. . . . There was never any question about Joel's honesty or integrity.

Respondent generously donated his time and efforts to various civic activities as well. He served as a member of the Margate City Recreation Committee and helped to reorganize and rebuild

that community's youth basketball league. He was a board member of the Little League and volunteered his time as an umpire, coach, and manager. Among the letters in the record written in support of respondent was one from Mary Maudsley, a DRB member who disqualified herself from this matter and whose letter emphasized respondent's sense of civic responsibility:

> During the time that I have known Joel Greenberg, his commitment was not only to the practice of law, but to the welfare of the larger community. He has been very active in coaching baseball and softball the years I have known him.
>
> I know that he has coached Little League, he served on the Margate City Recreation Committee, and coached High School Synagogue Baseball. Despite his recent difficulties, he has been coaching junior high softball. I believe these activities are representative of his commitment to the community which extends beyond the practice of law.
>
> I believe that the disciplinary process takes into account the opportunity for redemption. I have total respect for Joel Greenberg, and I hope to have him again as a colleague in the Atlantic County Bar.

The record before the Special Master demonstrated incontrovertibly not only respondent's genetic predisposition to depression but that symptoms of respondent's deepening depression were evident in late 1991 and early 1992, months before any of the critical acts of misconduct occurred. The history of depression in respondent's family included his younger brother's diagnosis of manic depression requiring frequent hospitalization and manifested by multiple attempts at suicide. Respondent's older sister was treated for depression with medication and psychotherapy. His father's sister also had been hospitalized for chronic depression.

The record also included evidence of a series of events in early 1992 that, according to the psychiatric experts, unquestionably triggered and aggravated the depression toward which respondent was genetically predisposed. In January 1992, respondent's mother was diagnosed with kidney cancer. In March 1992, respondent's wife was required to undergo major back surgery, resulting in respondent assuming substantial responsibility for her care during an extended recuperative period.

In addition, respondent's neighbor and friend Mark Ettes, a casino executive, was killed in a helicopter accident, and respon-

dent assumed significant responsibilities in assisting Ettes's widow and two children after his death. Mrs. Ettes retained respondent's law firm to institute a civil action to recover damages for her husband's death. Witnesses confirmed that Mrs. Ettes's request to respondent's partners, without any explanation, that respondent not be involved in that litigation caused respondent great anguish and personal humiliation. Also, in the spring of 1992, respondent's law firm decided to discontinue its representation of MIIX, respondent's most important client whose medical malpractice litigation accounted for the bulk of respondent's legal work.

The symptoms of respondent's deepening depression were evident to his friends. In a matter of months respondent gained approximately fifty pounds. He began the practice of working with his office door closed. Several colleagues testified that on occasion they found him sitting at his office desk asleep during the day. He became careless about returning telephone calls and keeping appointments. He declined lunch invitations. He became introverted and withdrawn. His professional habits also were affected. Witnesses testified that he became neglectful about details such as answering interrogatories and preparing for depositions.

In addition, numerous witnesses testified about the marked change in his personal demeanor. Attorney Sayegh's testimony reflected the observation of several friends and colleagues:

There is something wrong with this guy, something is—there's something in the way I—the way he looked at me, the way he spoke to me, it was his—the manner of his—[of] how I knew him of being—he was always an optimistic person. He always had a sense of humor. He was always kind. He always made a connection with people. He connected with you. It wasn't one of those, you know, hi, how are you doing, and you really don't know who you're talking to and you just move on in your day. I mean when I saw Joel, he would make a connection with me. This is the way he was. He was a unique personality. He was a unique person. And it was gone. I mean it was bizarre. I mean this was not a guy—I think I wrote in my letter I mean this was not a guy having a bad day. You know, he didn't get stressed out by some case he had or some judge yelled at him. I mean that's not what happened. It was there was something in his eyes. There was something in the way he spoke to me.... There was something wrong with the look in his eyes.

As I've said, he was a different person and I—it struck me all of a sudden and I was very upset by it and I knew there was something wrong with him.

Dr. Norman Chazin, respondent's treating psychiatrist, testified that on September 15, 1993, the day after respondent disclosed his misappropriations to his friend Paul D'Amato, D'Amato referred respondent to Chazin for treatment, describing him as suicidal. Dr. Chazin's testimony described the history he took from respondent, which included a description of the significant events that contributed to respondent's sense of worthlessness and low self-esteem and exacerbated his depression. Respondent described himself as falling apart and unable to function. He complained of insomnia, fatigue, anxiety, loss of motivation, and feelings of helplessness. He described an aborted suicide attempt in the spring of 1992, and inclinations toward self-destructiveness and suicidal acts over a prolonged period. Notwithstanding those severe symptoms, respondent stated that he was able to function reasonably well professionally and that the intensity of his trial practice would serve as a form of therapeutic relief.

Concerning respondent's ethical misconduct, Dr. Chazin characterized his misappropriations from his law firm as "wantonly self-destructive" behavior, and as a "desperate measure[ ] to prevent the self-destruction of his ego." Although respondent reported little, if any, conscious memory of his misappropriations, Dr. Chazin described the misappropriations as "the acts of a man who felt his life was essentially over," and observed that respondent's judgment was so impaired by his depression that he lacked the ability to control his self-destructive behavior. He characterized respondent's method of misappropriating funds as "so transparent that [it] assured he would be caught," thereby serving to "hasten a self-fulfilling prophecy of rejection and humiliation."

Dr. Chazin diagnosed respondent as suffering from dysthymic disorder, a chronic prolonged depression, as well as superimposed adjustment disorder with depression. He described respondent as having been depressed for many years as a result of both his genetic predisposition and childhood development, and that his chronic depression was aggravated and exacerbated by the series

of personal setbacks and assault on his ego. Dr. Chazin concluded that his deepening depression had a direct causal relationship to his acts of misappropriation, which he characterized as aberrational conduct.

As of February 1995, respondent continued to receive therapy twice weekly and had demonstrated significant improvement in mood, concentration, generalized well-being and interpersonal relationships. Respondent had addressed his behavior, depression, and personality characteristics and had substantially recovered from his illness. Dr. Chazin believed it to be highly unlikely that respondent would ever again engage in similar conduct, and considers him fit to resume the practice of law.

Dr. Gary Glass, respondent's expert, essentially agreed with Dr. Chazin's diagnosis and conclusions. He concurred that respondent was suffering from a dysthymic disorder, or chronic depression, as well as an adjustment disorder with depression and anxiety, and he characterized the combination of those disorders as a "major depression." Concerning respondent's misappropriations, Dr. Glass observed that respondent clearly did not take firm funds because he needed money. Rather, he attributed respondent's misconduct to a desperate need for recognition and appreciation. Dr. Glass noted that respondent "tried to gain recognition through helpfulness, dedication and success, but this did not work and instead he gained 'recognition' through self-destruction." Dr. Glass concluded that "Joel Greenberg is not a criminal type," and observed that respondent's unethical or "criminal" behavior was a direct outgrowth of his emotional illness:

> Specifically, he went through the motions appearing conscious and aware. He may have been aware of his behaviors, but he was certainly not aware of his driving forces. He was compelled to behave in this way by his innermost unconscious personality needs and was functioning from a purely unconscious drive and motivational state, unaware, in the conscious sense, of his needs.

Finally, Dr. Glass opined that respondent's motivation was not to hurt the firm:

> Rather, "[t]he motivation was to hurt Joel. The motivation was to cry out and say I need help. I can't say it in this way. I tried to get your attention this way. It

didn't work. I tried that way. It didn't work. Here's what I'm left with, desperate, tragic unfortunate and a terrible dilemma."

Dr. Robert Sadoff, the OAE's expert, agreed with Doctors Chazin and Glass that during the relevant period of July 1992 through August 1993, respondent suffered from a "major depressive disorder." As for the connection between respondent's depression and his misappropriations from his law firm, Dr. Sadoff testified that he found no evidence of antisocial personality or sociopathy in respondent, and believed that respondent's judgment was impaired by his depressive disorder. He agreed with Dr. Glass that in engaging in acts of misappropriation, respondent "was on a self-destructive bent and was calling attention to his needs.... He has certainly gotten their attention now and did so in a negative, self-destructive, neurotic manner." Dr. Sadoff disagreed, however, with Doctors Chazin and Glass in that he concluded that during the relevant time period respondent was not deprived of his cognitive function, and that his will was not overborn to the extent that he was unable to decide not to engage in misappropriation from his firm. Dr. Sadoff concluded that respondent "knew what he was doing, [ ] that his conduct was self-destructive and [that it] did call attention to him in a negative way." He observed that respondent's prognosis was good with continued treatment.

The Court declines to consider as evidence mitigating against disbarment the indisputable record proof that respondent's misconduct was the direct result of a major depressive disorder exacerbated by a series of personal setbacks and a genetic predisposition to depression. Applying the *Wilson* standard, the Court considers that evidence of depression as relating *only* to whether, pursuant to *Jacob, supra,* 95 *N.J.* at 137, 469 *A.2d* 498, respondent's comprehension and will were overborn. *Ante* at 157–58, 714 *A.2d* at 253. The Court's focus is too narrow. As in other pre-*Siegel* cases involving acts of dishonesty or theft, *see Farr, supra,* 115 *N.J.* at 237–38, 557 *A.2d* 1373; *Litwin, supra,* 104 *N.J.* at 367, 517 *A.2d* 378; and *Sears, supra,* 71 *N.J.* at 199–200, 364

A.2d 777, severe depression is relevant not merely in relation to cognitive capacity but also as a mitigating factor in determining the appropriate punishment for attorney misconduct.

The record includes other compelling mitigating evidence. Although William Colavito, the law firm's administrator, reported to the firm's managing partner his encounter with respondent on August 17, 1993, when respondent submitted a check request for $23,500 and then behaved strangely when questioned by Colavito, the law firm took no action. Rather, it was respondent who initiated the events that resulted in full disclosure of his conduct. On Saturday, September 11, 1993, at a social event in Ventnor, respondent asked to speak privately with Paul D'Amato, an attorney and friend of long standing. Respondent told D'Amato that he desperately needed his help, but did not explain the request. He became highly emotional and virtually incoherent, so D'Amato told respondent's wife to drive him home and arranged to meet respondent the next morning. The next day respondent met with D'Amato in his office. In the course of a highly emotional confrontation, respondent ultimately disclosed to D'Amato that he had misappropriated funds from his law firm. Because respondent was in a state of obvious emotional distress, D'Amato sought assistance from Edward Goldstein, a lawyer and childhood friend of respondent. Respondent told Goldstein and D'Amato to "call my partners right away," and added: "Get me away from the practice of law, I don't think I know what I'm doing any more." D'Amato and Goldstein recognized that respondent needed psychiatric intervention and arranged for him to see Dr. Chazin. With respondent's authorization, D'Amato met with members of respondent's firm that day and informed them about respondent's admissions to him.

Two days later on September 14, 1993, respondent informed the Office of Attorney Ethics of his misconduct and offered to relinquish his license to practice law. On September 17, 1993, he informed the Atlantic County Prosecutor that he had misappropriated law firm funds. On September 22, 1993, he entered into a

consent order suspending his license to practice. Within weeks after the law firm calculated the amount of respondent's misappropriations, respondent made full restitution.

The Court treats respondent's voluntary disclosure of his misconduct dismissively, observing that the record "supports an inference that he only came forward because he feared discovery." *Ante* at 160, 714 *A*.2d at 254. Although the record might support such an inference, no evidence was adduced to suggest that the law firm had discovered or contemplated taking any action concerning respondent's unauthorized withdrawals. A fairer conclusion to draw from the record, based on respondent's highly emotional state when he met with D'Amato and Goldstein, is that respondent no longer could cope with the awareness of his own criminality. The fact remains that, quite unlike the *Siegel* case, respondent disclosed his own misconduct, caused it to be reported to the appropriate authorities, and voluntarily made full restitution.

The remaining mitigating factor of exceptional significance in this proceeding is the submission of more than 120 letters from members of the Atlantic County Bar supporting respondent's readmission. In pre-*Siegel* cases involving acts of dishonesty or theft by attorneys, this Court consistently has taken into account the prior professional reputation of attorneys charged with misconduct in determining the appropriate discipline. *See, e.g., Silverman, supra,* 113 *N.J.* at 227, 549 *A*.2d 1225; *Stier, supra,* 108 *N.J.* at 461, 530 *A*.2d 786; *Labendz, supra,* 95 *N.J.* at 278–79, 471 *A*.2d 21; *Infinito, supra,* 94 *N.J.* at 58, 462 *A*.2d 160; *Sears, supra,* 71 *N.J.* at 199–200, 364 *A*.2d 777; *cf. Hoerst, supra,* 135 *N.J.* at 102–03, 638 *A*.2d 801 (noting relevance to discipline of outpouring of support as reflected in approximately seventy letters from colleagues attesting to respondent's character and legal ability). Cynics might diminish the significance of the letters in support of respondent as the product of an orchestrated campaign in his behalf. In my view, they constitute a unique testimonial to respondent's professional career and uniformly reflect that respondent was and is respected and trusted by the lawyers who

knew him best. A few excerpts make the point far more persuasively than any attempt to summarize them:

### Attorney Gerald J. Corcoran wrote:

In considering future disciplinary action, I would implore you to speak to those who know Joel Greenberg, and have practiced with him. I am confident that you will learn that whatever conduct occurred was a transient episode in an otherwise unblemished career. When Mr. Greenberg was mentally and physically healthy, he was an asset to the Bar Association and exemplified the highest standard of professional responsibility and ethical conduct. When his health returns, I am confident he will again demonstrate those qualities.

When I learned of Mr. Greenberg's troubles I called him and offered my support. I do so again because it is unfair to judge Mr. Greenberg, or anyone, on a single incident, totally inconsistent with prior conduct and personal standards.

### Respondent's partner John W. Daniels, a member of his firm's executive committee, wrote:

Joel Greenberg's reputation for honesty and integrity in the community was and [is] excellent. He was very active in community endeavors and therefore was well known throughout the community. Despite his present problems, his reputation in that community is still intact and his current situation is only one that produces sympathy and questions as to when he will resume his professional activities.

I know that this situation is an isolated event. Joel has cooperated fully with the firm and with this investigation, and as an owner and shareholder in our firm, his conduct hurt only the firm and himself and no one else. I understand the pressures that Joel was faced with, and I also understand emotional illness that can lead someone to break under the pressure. However, I cannot understand any system that would not provide for rehabilitation and the ability to regain one's former position after rehabilitation.

### Willis F. Flower, a former President of the Atlantic County Bar Association, wrote:

In the mid–80s when I became a Trustee Officer and ultimately President of the Atlantic County Bar Association, Joel worked tirelessly for our various programs. During part of this time, he was a Trustee. Joel was significantly involved in our Association's attempts to improve bench/bar relations. We made important strides in improving communication between the bench and the bar in the handling and disposition of civil cases. This involved a substantial commitment of time and effort.

. . . .

Joel represented the interests of his clients tenaciously and zealously but he was able to resist the "win at any cost mentality" that, unfortunately, these days is too often present. Joel Greenberg's word was his bond. Joel Greenberg dealt forthrightly with his adversaries and did not attempt to litigate "by ambush" or by attacking his adversary or the adverse party personally. Joel was realistic and reasonable in the positions that he advocated and his goals seemed to be to resolve the conflict on reasonable terms rather than to utterly destroy the adversary. I am certainly aware of the vital necessity of protecting the integrity of the Bar's reputation and safeguarding our clients. I do not believe that the reinstatement of

Joel Greenberg is in any respect antithetical to such goals. Surely, we must maintain the high standards of the New Jersey Bar, but I for one would question those standards if we cannot recognize that human beings will make mistakes, that human beings can be rehabilitated and that when they are, they should be permitted to atone.

### Jack Gorny, one of respondent's partners, wrote:

I have always had great trust in Joel's integrity and, in fact, to this day he has a key to my home.

In retrospect, over the last several years there has been a dramatic change in his personality and interaction with people in our office. In the past, he always was gregarious, outgoing and looked forward to having lunch and engaging in athletic events with other people in the firm. Over the last few years, that changed. Hindsight now makes it clear that there was an ongoing process by which he excluded himself from contact with other lawyers in the office. He began to regularly not attend firm social functions and tended to eat lunch by himself and cut back his participation in sports activities that others engaged in here. While I am not qualified to make psychological assessments or reach psychiatric conclusions, it appears now that we missed signs of a hard working lawyer who had no longer been able to emotionally connect with his peers. He chose not to be a socially active partner and this was a significant departure from his earlier personality. It developed in a gradual manner and, thus, was not as readily discernible as it should have been. Had we paid closer attention to these changes and understood their significance, perhaps the situation in which he finds himself presently would not have occurred.

While his recent actions are certainly inappropriate and regrettable, they should be dealt with in an understanding, compassionate and constructive manner. Nearly 20 years of hard work, dedication and community service should not be simply ignored. He has clearly made a grievous mistake but one which I believe arose from emotional difficulties, not a blatant desire to be dishonest. He has suffered greatly as a result of his actions, as have his wife, three children and the rest of his family. He is a young man and the rest of his work life should not be taken from him.

### Edwin F. Jacobs, Jr. wrote:

I know next to nothing of Joel's current ethical problems and will therefore remain silent as to them. I do, however, know a bit about Joel, having been a professional acquaintance for approximately twenty years. If asked by any person or agency to state an opinion of Joel, I would without hesitation characterize him as a very steady, conscientious and honest attorney. I have never had occasion to question his spoken word, written representation or, in general, integrity. I expect that most other local attorneys would agree with what I have said in this letter.

### B

This is a difficult disciplinary proceeding for the Court to resolve. Its institutional concern is with the magnitude of the misconduct, the theft of funds from respondent's law firm over an extended period. However, as one of respondent's partners observed, no outside victims are implicated; only respondent and the

firm were harmed, and the firm has been made whole. That the leadership of respondent's law firm supports his readmission to the practice of law is perhaps the most profound evidence that respondent's misconduct was aberrational and the result of a major depressive disorder. His law partners understand better than anyone that his misappropriations were totally incompatible with his character, his values, and his entire professional career.

What then must be said of the Court's institutional responsibility? I would urge that this is not the case for the Court to reaffirm its continuing commitment to the *Wilson* rule or to communicate its unwillingness to depart from or modify *Wilson*'s rationale. *Wilson* is not implicated because no client funds were taken. Either on that ground, or by applying *Siegel* only prospectively, the Court need not confront the rigidity of the *Wilson* holding.

Moreover, this record is unique because of the undisputed connection between respondent's mental illness and his misconduct, because of respondent's obvious reconciliation with his law firm, and, finally, because of respondent's extraordinary reputation among his colleagues at the bar. This is not a case for formulaic discipline. This is a case for our traditional individualized discipline that fairly reflects the strength of the mitigating evidence and the truly aberrational nature of the misconduct.

The public will fully understand if we determine that on this record disbarment is not mandated. The lawyers who know Joel Greenberg best will not understand if we do otherwise.

O'HERN, J., joins in this opinion.

## · ORDER

It is ordered that **JOEL A. GREENBERG** of **ATLANTIC CITY,** who was admitted to the bar of this State in 1975, be disbarred and that his name be stricken from the roll of attorneys of this State, effective immediately; and it is further

ORDERED that **JOEL A. GREENBERG** be and hereby is permanently restrained and enjoined from practicing law; and it is further

ORDERED that **JOEL A. GREENBERG** comply with *Rule* 1:20–20 dealing with disbarred attorneys; and it is further

ORDERED that all funds, if any, currently existing in any New Jersey financial institution maintained by **JOEL A. GREEN-BERG**, pursuant to *Rule* 1:21–6, be restrained from disbursement except upon application to this Court, for good cause shown, and shall be transferred by the financial institution to the Clerk of the Superior Court who is directed to deposit the funds in the Superior Court Trust Fund, pending further Order of this Court; and it is further

ORDERED that respondent reimburse the Disciplinary Oversight Committee for appropriate administrative costs incurred in the prosecution of this matter.

*For disbarment*—Chief Justice PORITZ, and Justices HANDLER, POLLOCK, GARIBALDI, and COLEMAN—5.

*Dissenting*—Justices O'HERN and STEIN—2.